Winthrop F. DAVIS, Appellant,

v.

**CHEVY CHASE FINANCIAL LIMITED and B. Francis Saul.**

No. 80–1297.

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1981.

Decided Oct. 15, 1981.

Robert H. Hishon, Atlanta, Ga., for appellant.

Leslie A. Nicholson, Jr., Washington, D.C., with whom Robert B. Robbins, Washington, D.C., was on the brief, for appellees.

Before McGOWAN, Senior Circuit Judge, and TAMM and WALD, Circuit Judges.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this case appellant Winthrop F. Davis challenges the district court's grant of summary judgment on both counts of a complaint filed against his former corporate employer and one of its officers. At stake in the litigation is the right of ownership of 4,960 shares of stock in appellee Chevy Chase Financial Limited (CCFL or Company) purchased by Davis during his tenure as an employee. An arbitrator construing the written agreement governing the stock transaction ruled that Davis was contractually obliged to tender the shares to CCFL upon termination of his employment. Following the adverse ruling, Davis filed this suit seeking vacatur of the arbitration award and equitable relief under provisions of the federal arbitration and securities laws. The district court granted summary judgment for appellees on both counts of Davis' complaint and upheld the arbitration award, prompting this appeal. Although mindful of the deference properly accorded arbitration decisions, we find that the arbitrator exceeded his authority and therefore vacate much of his ruling. We also conclude that the entry of summary judgment against appellant was erroneous and accordingly reverse and remand for appropriate proceedings.

## I. BACKGROUND

In August of 1973 appellant Davis began his employment with CCFL, a Bermuda corporation with its principal office in this country. At the commencement of his employment, Davis and CCFL executed a Stock Purchase Agreement ("Agreement") under which Davis became the owner of 4,960 shares of stock in the Company. The Agreement contained provisions restricting

Davis' right to alienate his minority interest in CCFL and obligating the Company to purchase the shares if Davis wished to dispose of them. The regime governing the subsequent transfer of the shares distinguished between dispositions taking place during the first five years of Davis' employment and those taking place after five years of his service to CCFL had elapsed.

On January 12, 1979, slightly more than five years after joining the Company, Davis left its employ. Purporting to rely on the terms of the Agreement, CCFL demanded that Davis tender his shares back to the Company. When Davis refused, CCFL invoked the Agreement's arbitration clause and submitted the dispute to an arbitrator. Although Davis denied that the matter was one subject to arbitration and accordingly protested the submission, he participated fully in the ensuing proceeding. Upon briefing and oral argument, the arbitrator rejected the contention that Davis was under no contractual obligation to resell the shares to CCFL and ordered their conveyance for $31,793.60, or $6.41 per share.

Following the arbitrator's decision, Davis commenced this litigation by filing a two-count complaint in the United States District Court for the District of Columbia. In Count I Davis sought vacatur or modification of the arbitration award under the relevant provisions of the United States Arbitration Act, 9 U.S.C. §§ 10(d), 11(b) (1976).[1] He alleged that the arbitrator had jurisdiction to determine only the value of shares that Davis voluntarily wished to alienate, and thereby exceeded his authority in ruling that Davis was obliged to offer the shares to CCFL. In his alternative

Count II, Davis charged that appellees CCFL and B. Francis Saul, II, one of its officers,[2] violated the antifraud provisions of the federal securities laws, 15 U.S.C. § 78j (1976), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1981), in connection with the initial sale of the CCFL stock. The gravamen of this count is that the appellees, in demanding that Davis transfer the CCFL shares, attempted to enforce the Agreement in a manner contrary to oral representations made contemporaneously with its execution. Davis alleged that CCFL officials had stated when he signed the Agreement that if he remained in the employ of the Company for five years, he could retain ownership of the shares indefinitely, regardless of his subsequent employment status. Davis sought declaratory and injunctive relief that would permit him to remain the owner of the stock.

Prior to trial appellees filed for summary judgment on both counts, and Davis offered a cross-motion for summary judgment on the first count. In a brief memorandum order the district court granted appellees' motion on both claims. *Davis v. Chevy Chase Financial Ltd.*, No. 79–3244 (D.D.C. Feb. 15, 1980), Memorandum Order (M.O.); Joint Appendix (J.A.) at 127–29. The trial judge concluded that the arbitrator was empowered under the Agreement to determine whether Davis was contractually obliged to tender the shares to CCFL. M.O. at 2; J.A. at 128. As an independent, alternative ground for summary judgment on Count I, the district court examined the Agreement and found that it unambiguously bound Davis to offer the CCFL shares to

---

1. The jurisdiction of the district court was properly invoked under sections 9 and 10 of the United States Arbitration Act, 9 U.S.C. §§ 9–10 (1976), and diversity of citizenship. The arbitration sections provide, *inter alia*, that the United States court for the district in which an arbitration award is made may entertain actions seeking to vacate or modify such awards upon the application of any arbitral party. In the instant case, the arbitration was conducted in Washington, D.C., under the aegis of the American Arbitration Association, and the award was entered there. Joint Appendix (J.A.) at 19, 25.

2. There seems to be some question as to the corporate office held by appellee Saul. Appellant claims Saul was and is Chairman of the Board of Chevy Chase Financial Limited (CCFL), Complaint at ¶ 2, J.A. at 1, while appellees state that he is the President of CCFL, Brief for Appellees at 1. At any event, Saul was an officer and major shareholder of CCFL at the time the shares were conveyed to Davis and was of similar status when Davis left the Company.

the Company at the time his employment was terminated. Davis' termination was, the court found, an "Event of Sale"[3] under the Agreement that imposed an unconditional obligation to tender the shares to CCFL, and not a mere right of first refusal in the Company as Davis had claimed. *Id.* As for Count II, the district judge concluded that, as "no evidence before the Court [indicates] that the Securities Act or SEC Rules were violated," summary judgment in favor of appellees was appropriate.[4] *Id.* This appeal ensued.

## II. DISCUSSION

Davis raises three issues in this appeal. First, he renews his objection to the arbitration award, arguing that the arbitrator exceeded his authority in ruling on Davis' obligations under the Agreement. Second, he challenges the district court's independent construction of the Agreement. Finally, he contends that summary judgment on the federal securities claims was inappropriate, as there existed a genuine issue of material fact regarding the alleged oral misrepresentations.

### A. *The Arbitrator's Authority.*

Federal courts are empowered under section 10[5] of the United States Arbitration Act to vacate arbitration awards if any of several specified conditions are met. The only condition relevant in the current context is contained in section 10(d) of the Act, which provides in pertinent part that an award may be vacated where the arbitrator "exceeded [his] powers."[6] Appellant contends that the Agreement unambiguously limited the authority of the arbitrator to the determination of a single issue, the fair market value of any CCFL shares of which Davis wished to dispose. Davis argues that, as he had no desire at any time to alienate any of the CCFL shares and was not under any obligation to sell them, no dispute subject to arbitration under the Agreement existed. In appellant's view, therefore, the entire award must be treated as a nullity.[7]

Before turning to the details of these contentions, we note at the outset the limited review function properly performed by a federal court in scrutinizing an arbitration award. There is a strong federal policy that favors the submission of civil disputes to arbitration as an alternative to the "complications of litigation." *Wilko v. Swan,* 346 U.S. 427, 431, 74 S.Ct. 182, 184, 98 L.Ed. 168 (1953); *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 2453, 41 L.Ed.2d 270 (1974). Where parties have selected arbitration as a means of dispute

---

3. The district court termed the relevant definitional rubric an "Event of Default." *Davis v. Chevy Chase Financial Ltd.,* No. 79–3244 (D.D.C. Feb. 15, 1980), Memorandum Order at 2; J.A. at 128. The terminology employed in the Agreement is that noted in the text.

4. When Davis failed to comply in a timely fashion with the district court's Judgment Order of February 27, 1980, the district judge granted appellees' petition for post-judgment relief by ordering the record transfer of the disputed shares on the books of CCFL and the voiding of Davis' stock certificates in return for the payment to appellant's counsel of $31,763.60. *Davis v. Chevy Chase Financial Ltd.,* No. 79–3244 (D.D.C. Apr. 16, 1980) (order granting post-judgment relief); J.A. at 147–48. The disputed shares thus are now held by CCFL or its designees.

5. 9 U.S.C. § 10 (1976).

6. Section 10(d) of the Act authorizes vacatur of an arbitration award "[w]here the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(d) (1976).

7. Applying substantively identical legal analysis, Davis seeks in the alternative relief under section 11(b) of the Arbitration Act, 9 U.S.C. § 11(b) (1976), which empowers federal courts to modify an award "[w]here the arbitrators have awarded upon a matter not submitted to them ...." In the arbitration context, the "submission," of course, refers to the specific contract or agreement stating the precise issues to be arbitrated. *See* C. Updegraff, Arbitration and Labor Relations 125 (1970). Although we note that attacks on the jurisdiction of arbitrators are usually pursued under the framework of § 10(d), we need not in this case distinguish the two subsections; the power to review arbitration awards made with regard to nonarbitral matters derives from both. Our subsequent analysis, however, will employ the § 10(d) terminology.

resolution, they presumably have done so in recognition of the speed and inexpensiveness of the arbitral process; federal courts ill serve these aims and that of the facilitation of commercial intercourse by engaging in any more rigorous review than is necessary to ensure compliance with statutory standards. It is particularly necessary to accord the "narrowest of readings" to the excess-of-authority provision of section 10(d). *Andros Compania Maritima v. Marc Rich & Co.*, 579 F.2d 691, 703 (2d Cir. 1978). That provision does not, it must be stressed, confer on courts a general equitable power to substitute a judicial resolution of a dispute for an arbitral one; rather, where the interpretation of a contract is at issue, "[i]t is the arbitrator's construction which was bargained for," and not that of the courts. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960).

■ Arbitration is, however, a matter of contract, and the contours of the arbitrator's authority in a given case are determined by reference to the arbitral agreement. Parties to such an agreement cannot be required to submit to arbitration any matter that they did not agree would be subject to that manner of dispute resolution. *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). A party who consents to the inclusion in a contract of a limited arbitration clause does not thereby waive his right to a judicial hearing on the merits of a dispute not encompassed within the ambit of the clause. In sum, the genesis of arbitral authority is the contract, and arbitrators are permitted to decide only those issues that lie within the contractual mandate. By necessary implication, an arbitral award regarding a matter not within the scope of the governing arbitration clause is one made in excess of authority, and a court is precluded from giving effect to such an award. *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361; *J. P. Greathouse Steel Erectors, Inc. v. Blount Brothers Construction Co.*, 374 F.2d 324 (D.C.Cir.), *cert. denied*, 389 U.S. 847–48, 88 S.Ct. 64, 19 L.Ed.2d 116 (1967).

■ We turn now to the arbitration provision in the Agreement between Davis and CCFL. The only reference to arbitration is contained in Paragraph 4, which is headed "Disposition of Shares after Five Years." Under subparagraph a, if a sale between Davis and CCFL is to occur, the price is to be the "fair market value" of the shares. Subparagraph b then provides a mechanism for the determination of this value. It provides in pertinent part:

> b. The fair market value of the offered Shares shall be determined by mutual agreement between the Corporation and Stockholder. If they are unable to so agree, the matter shall be submitted promptly to arbitration under the rules of the American Arbitration Association. The determination of the arbitrator or arbitrators shall be final and binding upon Stockholder and the Corporation as to the fair market value of the offered Shares ....

J.A. at 12. When Davis left CCFL in 1979 and refused to resell the shares, the Company filed a "Demand for Arbitration" under the Commercial Arbitration Rules of the American Arbitration Association. J.A. at 19. In that demand CCFL invoked the benefit of subparagraph 4b and defined the dispute as involving *only* the valuation of the shares.[8] *Id.* CCFL did not, we note, state in the demand that the question of

---

**8.** In defining the dispute, CCFL stated:

NATURE OF DISPUTE: Pursuant to a Stock Purchase Agreement dated August 21, 1973, between Winthrop F. Davis and Chevy Chase Financial Limited ("the Corporation"), the Corporation is entitled to repurchase shares in the Corporation owned by Mr. Davis upon the occurrence of an Event of Sale (as defined in the Stock Purchase Agreement) after August 21, 1978, at fair market value as determined pursuant to paragraph 4(b) of that Agreement. The Corporation has exercised its right to repurchase, but the parties have been unable to agree on the fair market value of the shares for repurchase by the Corporation. Paragraph 4(b) of the Agreement, which is attached, provides for resolution of such a dispute by arbitration.

J.A. at 19.

appellant's alleged obligation to tender the shares was an aspect of the described dispute. *Id.*

In his answering statement to the arbitrator, Davis denied that any arbitral dispute existed as he did not wish to dispose of his shares and was not under any obligation to sell them to CCFL. J.A. at 22–23. In his second answering statement, Davis renewed his objections to the arbitrator's jurisdiction and reserved his right to challenge any award on jurisdictional grounds. J.A. at 72–75. In the arbitration proceeding, the question whether the conditions precedent to arbitration under the Agreement had been met was fully ventilated; the arbitrator found that Davis' termination triggered an obligation on the appellant's part to tender the shares to CCFL. The arbitrator then computed the fair market value of the shares and "ordered" their conveyance to CCFL.[9]

We agree with appellant that the arbitrator exceeded his authority in ruling that Davis was contractually obliged to sell his shares to CCFL. Although the arbitration clause at issue here did not explicitly bar consideration of questions other than the value of the shares, we find that the relevant wording necessarily implied that the arbitrator's authority was so limited. When viewed in the overall context of the Agreement, subparagraph 4b is susceptible, we believe, of no construction other than that offered by appellant. The clause clearly provides that the arbitrator may act only to determine the value of "offered" shares when CCFL and Davis cannot agree on the proper price.

Appellees, citing the "federal policy to construe liberally arbitration clauses,"[10] contend that where an arbitrator makes findings on the scope of his authority, such rulings should only be set aside where "completely irrational"[11] or so "palpably faulty"[12] that no judge could ever have made such a ruling. Appellees, however, misconstrue both the nature of the inquiry in this case and the appropriate role of the reviewing court in passing on arbitrability disputes. When a reviewing court is called upon to determine whether an arbitrator, in passing on a matter *concededly within his jurisdiction*, misconstrued the contract in question, great deference is appropriate; to use Justice Douglas' often-cited phrase, the award in such a case must be affirmed if it "draws its essence" from the governing agreement. *Enterprise Wheel*, 363 U.S. at 597, 80 S.Ct. at 1361. Although various tests have been employed in implementation of this broad standard, it is apparent that the arbitrator's award should not be upset in such a case if it represents a plausible interpretation of the contract. *Federated Employees of Nevada, Inc. v. Teamsters Local No. 631*, 600 F.2d 1263, 1264 (9th Cir. 1979).

Where, however, a party to an arbitration proceeding challenges the arbitrator's *authority* to decide a particular issue, the function of a reviewing court is distinctly different. The threshold question

---

9. In the proceedings in the district court, appellant Davis challenged the authority of the arbitrator to "order" the transfer of the shares. *See* Complaint of Plaintiff Winthrop F. Davis at 4; J.A. at 4. We agree with appellant that this order exceeded the authority of the arbitrator; indeed, appellees concede the point. *See* Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment at 9; J.A. at 42. We also agree, however, with appellees' argument that the point is without substantive importance. *See* Memorandum of Points and Authorities in Support of Defendants' Opposition to Plaintiff's Cross-Motion for Summary Judgment as to Count One, and Reply to Plaintiff's Opposition to Defendants' Motion to Dismiss or, in the Alternative, for Summary Judg-

ment at 5; J.A. at 120. If the arbitrator had authority to determine the fair market value of the shares, a court order to enforce the award would issue at the request of either party.

10. Brief for Appellees at 11, *quoting Metro Indus. Painting Corp. v. Terminal Constr. Co.*, 287 F.2d 382, 385 (2d Cir.), *cert. denied*, 368 U.S. 817, 82 S.Ct. 31, 7 L:Ed.2d 24 (1961).

11. Brief for Appellees at 7, 12, *quoting Nat'l R. R. Passenger Corp. v. Chesapeake & O. Ry.*, 551 F.2d 136, 142 (7th Cir. 1977).

12. Brief for Appellees at 9, *quoting Lucas v. Philco-Ford Corp.*, 399 F.Supp. 1184, 1188 (E.D. Pa.1975).

of arbitrability is one of law, and a reviewing court is obligated to make its own determination of the issue. *Mobil Oil Corp. v. Local 8–766*, 600 F.2d 322, 324–25 (1st Cir. 1979). The court's decision may, of course, be informed by the arbitrator's resolution of the arbitrability question, *id.* at 325, and we agree with appellees that, where the scope of arbitration is "fairly debatable" or "reasonably in doubt," the arbitrator's assumption of jurisdiction should be upheld. Brief for Appellees at 10, *quoting Butler Products Co. v. Unistrut Corp.*, 367 F.2d 733, 736 (7th Cir. 1966). Neither arbitrators nor courts, however, have the prerogative to redraft an arbitration clause to require parties to arbitrate matters that they did not initially agree to arbitrate. *Farkar Co. v. R. A. Hanson DISC, Ltd.*, 583 F.2d 68, 72 (2d Cir. 1978).[13]

We therefore reject the proposition that the inclusion of a limited arbitration clause in a contract empowers an arbitrator to make largely nonreviewable decisions regarding his jurisdiction. To hold otherwise through endorsement of appellees' conception of our reviewing function would run the unacceptable risk of denying parties their right to a judicial forum to resolve disputes.[14] We reject as well appellees' contention that, in the absence of express language to the contrary, an agreement to arbitrate an issue carries with it a concomitant power to determine arbitrability with limited judicial review. Brief for Appellees

at 11. Where, as here, language is employed that suggests a limited scope of authority for the arbitrator, a more rational inference is that the parties themselves intended to determine if an arbitral dispute existed, with the assistance of the courts if necessary.[15] In sum, we find that this arbitration clause gave the arbitrator authority to determine only the "fair market value" of any CCFL shares that Davis was transferring, voluntarily or pursuant to a contractual obligation, to the Company.

■ Finally, appellees argue that as Davis himself raised the question of arbitrability in the arbitration proceeding, he thereby waived his right later to object to the arbitrator's assumption of jurisdiction. Brief for Appellees at 10–11. Although we are mindful of the policy favoring submission of disputes to arbitration, we cannot accept the appellees' waiver argument where what is at issue is the jurisdiction of the arbitrator. Davis did in this case raise the arbitrability question; he did so, however, with full reservation of his right to have the arbitrator's determination subjected to judicial review. The factual context of the case at bar is quite similar in this regard to that confronted by the court in *Local 719, American Bakery & Confectionary Workers of America v. National Biscuit Co.*, 378 F.2d 918, 921–22 (3d Cir. 1967). In *Local 719*, when faced with a waiver argument virtually identical to that offered by appellees here, the court noted:

**13.** As the *Farkar* court noted, "just as the parties had the right to choose arbitration as part of their agreement so did they have the right to circumscribe its scope." 583 F.2d at 72.

**14.** We note, moreover, that the cases cited by appellees to support the arbitrator's decision on arbitrability here provide, at best, tepid support for that decision. In *Galt v. Libbey-Owens-Ford Glass Co.*, 397 F.2d 439 (7th Cir.), *cert. denied*, 393 U.S. 925, 89 S.Ct. 258, 21 L.Ed.2d 262 (1968), it is true that the court stated that "[q]uestions of arbitrability are initially for the arbitrators . . . ." *Id.* at 442. The relevant provision in that case was, however, a broad one that called for arbitration of disputes arising "in connection with the performance of this agreement." *Id.* at 441 n.1. The reviewing function of a court faced with such a provision will almost necessarily be a limited one. More-

over, the *Galt* court noted that even given the "initial" determination by the arbitrator, review of the decision, though limited, was nonetheless appropriate. *Id.* at 442.

Nor does *Butler Prod. Co. v. Unistrut Corp.*, 367 F.2d 733 (7th Cir. 1966), assist appellees. In *Butler*, though the court noted that if the scope of the arbitration agreement was "fairly debatable" then the arbitrator's determination should be upheld, it refused to order arbitration there; the court stated, rather, that arbitration was not mandated where there was no agreement to arbitrate the particular issue under consideration. *Id.* at 736.

**15.** *See also Rosenthal v. Emanuel, Deetjen & Co.*, 516 F.2d 325, 327 (2d Cir. 1975) ("The mere assertion that there is a dispute that is arbitrable does not make one exist.").

[W]here as here the reluctant party has presented its objection to arbitrability to the arbitrator and has not thereafter clearly indicated its willingness to forego judicial review, we believe that the issue is sufficiently preserved for our subsequent judicial inquiry.

*Id.* at 922. Although we are aware of decisions suggesting that review of an arbitrator's determinations of arbitrability should be limited, *see, e.g., Yakima Newspaper Guild, Local 27 v. Republic Publishing Co.*, 375 F.Supp. 945, 947 (E.D.Wash.1974), we agree with the court in *Local 719* that such a rule might actually *foster* litigation by requiring parties disputing arbitrability to seek "interlocutory" review of jurisdictional rulings. 378 F.2d at 921. Accordingly, we find that Davis did not forfeit his right to judicial consideration of arbitrability by submitting the question initially to the arbitrator.

We hold, therefore, that the arbitrator exceeded his authority in ruling that Davis was contractually obliged to sell the CCFL shares to the Company and vacate his decision on that question.

B. *The District Court's Construction of the Agreement.*

In concluding that Davis was bound under the Stock Purchase Agreement to tender the CCFL shares to the Company, the district judge did not rely solely on the arbitrator's construction of that document. Rather, he determined through independent analysis that the Agreement unambiguously required Davis to return the stock upon the termination of his employment. M.O. at 2; J.A. at 128. With only the document itself and the parties' briefs before him, the trial judge rejected appellant's claim that the Agreement was at least sufficiently unclear to preclude summary judgment. Given our disposition of appellant's challenge to the arbitrator's decision, the trial court's summary determination of the meaning of the Agreement must be reviewed by the same standards we would apply to the review of any district court's interpretation of a contract as a matter of law. Although

respectful of the efforts of the district judge in attempting to construe the Delphic language in this Agreement, we cannot agree that its provisions are so clear that appellant should have been denied the opportunity to present evidence supporting his arguments.

At first blush, the Agreement appears to present a simple and straightforward scheme to govern the disposition of the shares following their initial sale to Davis. Paragraph 3, which was controlling during the first five years of Davis' employment, provides that should Davis wish to sell the shares, or should an "Event of Sale" occur that mandates sale, CCFL is obliged to purchase them at their "book value." Paragraph 4 governs disposition of the shares after five years and hence is the key provision in the current litigation. All the parties agree that if Davis were still employed by CCFL, the Company would have only a right of first refusal if Davis wished to sell the shares. The central issue in the current litigation is the effect of Davis' termination under the Agreement.

We will turn first to Paragraph 4 of the Agreement; it provides, in pertinent part:

4. Disposition of Shares after Five Years.

a. If subsequent to the expiration of the five year period referred to in paragraph 3.a herein an Event of Sale occurs or Stockholder desires to pledge, encumber, sell or otherwise dispose of all or some of his Shares, then Stockholder shall first offer such Shares (or all of the Shares in the event of an Event of Sale) to the Corporation at a price equal to their fair market value determined as set forth in subparagraph b below.

J.A. at 12.

The appellant argues that the net effect of the provision is to confer on CCFL only a right of first refusal if Davis desires to dispose of the shares, which, of course, he does not. The determinative question, then, is the meaning of the phrase "If ... an Event of Sale occurs ... Stockholder shall first offer such Shares ... to the Corporation ...." The resolution of this

question turns initially on the definition of "Event of Sale," which is supplied in Paragraph 3:

> 3. <u>Purchase of Stock by Corporation.</u>
>
> a. If, during the period beginning on the date of this Agreement and ending five years thereafter, Stockholder offers some or all of the Shares to Corporation, Corporation shall purchase them at the price specified in subparagraph d below.
>
> b. Stockholder shall sell, and Corporation shall purchase, the Shares at the price specified in subparagraph d below, if any one of the following events (hereinafter called "Events of Sale") shall occur with respect to Stockholder during the five year period referred to in subparagraph a above:
>
> (1) Death,
>
> (2) Insolvency, bankruptcy or the making of an assignment for the benefit of creditors,
>
> (3) Stockholder is neither an employee of Corporation nor a member of any committee or board thereof, unless such is due to Stockholder's retirement either for disability or because he has become at least 55 years old.
>
> (4) ....

J.A. at 9. Davis is, of course, no longer an employee of CCFL, and thus, both sides agree, b(3) is the operative section.

Appellant Davis makes two main arguments regarding the Agreement. He contends initially that the phrase "Event of Sale" encompasses only a termination that occurs within the first five years of his employment. After that fifth year, he argues, there can be no "Event of Sale" under the above definition. Second, Davis argues that, even assuming his termination was such an "Event," the word "first" in "shall first offer" in Paragraph 4 confers on CCFL only a right of first refusal. Appellant contends that this construction—a mandatory resale to the Company during the first five years of his employment, with a right of first refusal in CCFL thereafter—provides a coherent structure to the Agreement. In the first five years, in which his "tenure" rights would presumably

be low, Davis must resell to the Company at a reduced "book value," though he does have a guaranteed buyer; after that time, however, when his tenure rights are theoretically greater, he need only offer the shares to the Company if he wishes to sell them. By contrast, appellant contends that CCFL's construction of the Agreement actually reduces Davis' rights as his service lengthens. According to the CCFL view, prior to the expiration of five years of service, the Company *must* purchase the shares whenever Davis wishes to sell them or an "Event" occurs, but *after* five years, there is no obligation on the Company to purchase—only an obligation on Davis to tender.

 When reviewing a grant of summary judgment, we are, of course, obliged to view the record in the light most favorable to the party opposing the motion and to resolve all questions of inference in favor of that party. Fed.R.Civ.P. 56(c); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Mazaleski v. Treusdell*, 562 F.2d 701, 717 (D.C.Cir.1977). In cases in which the dispositive issue involves the construction of a contract, summary judgment may be appropriate if the provisions of the contract are unambiguous. *See, e.g., Parish v. Howard*, 459 F.2d 616, 618 (8th Cir. 1972). The meaning of a contract is, however, usually a question of fact; as the Second Circuit noted in *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (1975), discerning contractual intent is a factual question unless the terms of the contract are "wholly unambiguous." *Accord, Landtect Corp. v. State Farm Mutual Life Insurance Co. of America*, 605 F.2d 75, 79–80 (3d Cir. 1979). As the Heyman court noted:

> Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper.

*Heyman*, 524 F.2d at 1320 (*quoting Aetna Casualty & Surety Co. v. Giesow*, 412 F.2d 468, 471 (2d Cir. 1969)). However the test

for determining the clarity of contract terms is formulated, the core notion is clear: summary judgment on a contract is appropriate only when the relevant provisions are so straightforward that they can be read in but one way.

The doctrines noted above make clear that courts should be reluctant to dispose summarily of claims involving the interpretation of contracts. Where a contract is not "wholly unambiguous," the parties have the right under principles of American contract law to present oral testimony and other extrinsic material to aid in its interpretation. *Heyman*, 524 F.2d at 1320. Courts should be especially cautious in determining summarily the meaning of contractual provisions where, as here, the law governing is likely that of a foreign nation, and thus is presumably unfamiliar.[16] Finally, the fact that both parties sought summary judgment on the contract claim does not in any way alter the applicability of these doctrines. *See* 6 Moore's Federal Practice ¶ 56.13 at 56–341 (2d ed. 1976 & 1980 Supp.).

Applying these principles, we cannot agree that this Agreement was susceptible of but one reasonable interpretation. It is manifest from the provisions set forth above that the document is hardly a model in elegance or clarity. To offer but a single example of possible ambiguity, in Paragraph 3 of the Agreement the parties use the language "shall sell" to describe the mandatory nature of Davis' obligation to tender the shares; by contrast, in Paragraph 4, the language "shall first offer" is used. Yet appellees argue that there is no difference in meaning between the phrases when an "Event of Sale" occurs. We cannot agree that the opaque language of Paragraph 4 is so clear that the introduc-

tion of relevant parol and other evidence would not aid in the process of construction. At base, the question is one of the intent of the parties; where that intent is unclear, as here, summary judgment is an inappropriate tool for dispute resolution. *Mazaleski*, 562 F.2d at 717 (summary judgment on question of motive); C. Wright & A. Miller, Federal Practice and Procedure § 2730 at 584–87 (1973).

In reversing the grant of summary judgment, we are not unaware of the factors that no doubt prompted both the arbitrator and the trial judge to order the sale of the shares. If an "Event of Sale" could occur only within the first five years of Davis' employment, then the inclusion of that phrase in a Paragraph headed "Disposition of Shares after Five Years" is a non-sequitur of classic dimension. Moreover, at oral argument counsel for appellees suggested that if an "Event" was not an occurrence mandating sale, the inclusion of that phrase in Paragraph 4 was without point; the language relating to Davis "desiring" to sell the shares would have encompassed all possibilities.

These arguments notwithstanding, we feel that summary judgment was inappropriate. Each side has presented a differing, reasonable construction of the Stock Purchase Agreement. Bermuda law, which presumably would govern,[17] permits the introduction of relevant evidence to shed light on the parties' intent.[18] Moreover, the credos of contract law cited by appellant—a document should be construed against the drafting party, and every word in an agreement should be given meaning—militate in favor of granting Davis his day in court. Brief for Appellant at 13–14. Finally, the appellant has steadfastly maintained that representations were made to him at the

16. Without deciding the potential conflict of law question posed in this case, we note that Paragraph 13 of the Stock Purchase Agreement provides that the laws of the Islands of Bermuda are to govern construction of the Agreement.

17. *See* note 16, *supra*.

18. Although we have done no in-depth study of Bermudan contract law, we note that that law is based and to this day draws on English common law precedents. The contract law of England permits the introduction of relevant parol and other extrinsic evidence to aid in the construction of ambiguous contractual provisions. *See* G. Chesire & C. Fifoot, Law of Contract 114–15 (9th ed. 1976).

time the Agreement was executed that he would be permitted to remain in possession of the shares, regardless of his employment status, if he remained in the employ of the Company for five years. Although the parol evidence rule operates with vitality in Bermuda, the law of that nation provides that a contemporaneous oral representation may override inconsistent written terms.[19]

Thus, we hold that the trial court should, upon remand, conduct such proceedings with regard to Count I as may be appropriate to permit the parties to ventilate fully their respective positions.[20]

### C. The Federal Securities Claims.

In the second count of his complaint, Davis asserted that the effort made by appellees CCFL and B. Francis Saul, II, to require the return of the shares contravened oral representations made by CCFL employees at the time the Agreement was executed. As noted above, Davis alleged in his complaint that CCFL officials told him that if his service to the Company lasted for five years, he was free to keep the stock indefinitely, regardless of his employment status. Although one can glean only the outlines of appellant's case from the complaint and briefs filed to date, presumably he contends that the alleged statements were false ones connected with the purchase or sale of a security, in violation of section 10 [21] of the Securities Exchange Act of 1934, and Rule 10b–5 [22] promulgated thereunder.

The district court granted appellees' motion for summary judgment on the securities claims, stating that there was "no evidence" before it in support of Davis' allegations. M.O. at 2; J.A. at 128. We believe that this ruling reflects a misunderstanding of the rule governing summary judgments

in the federal system, Fed.R.Civ.P. 56, and of the applicable case law. As this court has recently had occasion to discuss the issues raised in this regard, our discussion may be brief.[23]

Appellant has alleged that CCFL officials made representations in 1973 that are inconsistent with the position that the Company later adopted with regard to Davis' right to maintain ownership of the disputed shares. The appellees deny making any such representations. See Defendants' Response to Plaintiff's Statement Pursuant to Local Rule 1–9(g) at ¶ 2; J.A. at 113. There could hardly be a more patent example of a dispute involving a material fact; the representations at issue are the heart of appellant's securities claims. Resolving this dispute in Davis' favor, as we must at this stage, it is clear that summary judgment on Count II was inappropriate unless another rule or doctrine operates to deprive appellant of his day in court.

Given the cursory discussion contained in the order dismissing the securities claims, it is difficult to discern why the district judge did not conclude that the dispute surrounding the alleged misrepresentations required denial of appellees' motion. Presumably he relied on Fed.R.Civ.P. 56(e), which provides, in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

---

**19.** *See* G. Chesire & C. Fifoot, *supra* note 18, at 114–15, 221–22 (presenting English law, which generally prevails in Bermuda).

**20.** In light of our disposition of the grant of summary judgment on Count I, it is apparent that CCFL is no longer entitled to the post-judgment relief it was granted, *see* note 4, *supra.* Accordingly, upon request of appellant, the trial court should take appropriate steps to restore the parties to the status quo ante.

**21.** 15 U.S.C. § 78(j) (1976).

**22.** 17 C.F.R. § 240.10b–5 (1981).

**23.** *See National Ass'n of Gov't Employees v. Campbell,* 593 F.2d 1023, 1029–30 (D.C.Cir. 1978).

It is true· that the appellant in this case offered only his complaint to buttress his securities claims, while CCFL responded with the text of the Agreement. The appellees contend that the "mere allegations" of Davis' complaint are an insufficient basis for denying summary judgment; the district court apparently subscribed to this analysis.

Appellees' argument here, however, is without merit. As we noted in *National Association of Government Employees v. Campbell*, 593 F.2d 1023 (D.C.Cir.1978), it is beyond cavil that a party opposing summary judgment is required to proffer rebuttal affidavits or other evidence "only if its omission enables the movant to satisfy his burden of showing that no issue of material fact persists." *Id.* at 1029. The Supreme Court has noted in this regard that "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied *even if no opposing evidentiary matter is presented.*" *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970) (emphasis in original, footnote omitted) (*quoting* Advisory Committee Note on the 1963 amendment to Fed.R.Civ.P. 56(e)). We, of course, agree with the *Campbell* court's admonition to parties and counsel that it is both preferable and advisable to come forward with rebutting materials, *Campbell*, 593 F.2d at 1029. It is clear, however, that where the pleadings themselves make clear the existence of a material factual controversy, summary judgment is precluded regardless of the dearth of "counter-active" materials submitted by the opposing party. *Id.*

Appellees offer an alternative ground in support of the district court's disposition of the securities claims. CCFL, relying on the arbitrator's decision, contends that the doctrine of res judicata bars the appellant from relitigating an issue that necessarily was adjudicated in the prior proceeding. Appellees submit that the question whether the alleged oral representations were made was presented to the arbitrator and that the arbitrator's rejection of the argument estops Davis from relitigating the same dispute in the masquerade of a securities claim. Given our disposition of the arbitrator's decision, *see* Part IIA, *supra*, this contention need not detain us long.

It is true, as appellees contend, that an arbitration decision can have res judicata effect, *see, e.g., Maidman v. O'Brien*, 473 F.Supp. 25, 29 (S.D.N.Y.1979), even if the underlying claim involves the federal securities laws, *see Moran v. Paine, Webber, Jackson & Curtis*, 389 F.2d 242, 245–46 (3d Cir. 1968). Such decisions can also have collateral estoppel effect where the legal theories vary between the two actions, but the first necessarily involved the litigation and determination of a matter raised again in the subsequent case. On the other hand, it is axiomatic that, before a judgment can have issue preclusive effect under the doctrines of either res judicata or collateral estoppel, that judgment must be *valid.* 1b Moore's Federal Practice ¶ 4.–1 at 634–39 (1980). As we noted above, *see* Part IIA, the arbitrator lacked the authority to construe the Agreement to determine Davis' obligations under it; hence, any rulings he made regarding the meaning of the contractual terms and the alleged oral representations can have no issue preclusive impact.

We hold, therefore, that· appellees' motion for summary judgment on Count II was improperly granted and accordingly reverse that judgment and remand for trial.

### III. CONCLUSION

We are mindful in this case of both the utility of arbitration as a tool of dispute resolution and of the propriety and value of summary proceedings in our over-taxed judicial system. The value of arbitration depends, however, in large measure on the fidelity paid by arbitrators to the contracts from which their powers derive. In this case, the arbitration clause envisaged a limited role for the arbitrator; the patent misplaying of that role mandates judicial action. Thus, we vacate that part of the arbitration award that purported to set forth appellant's duties under the Stock Purchase Agreement.

In light of our remand of this case for trial on Count I of Davis' complaint, however, it is not appropriate at this time for us to vacate the arbitrator's determination of the market value of the CCFL shares. The question whether the arbitrator had jurisdiction to determine that value depends upon the construction of the Agreement. If, upon the termination of the remanded proceedings involving Count I, the trial judge finds that Davis was obliged under the Agreement to sell the shares, then appellees may take appropriate steps to compel sale at the price already established by the arbitrator. If, on the other hand, the trial court rules that Davis is entitled under the Agreement to retain ownership of the shares, then the fair market value determination would presumably be a nullity.

Finally, for the reasons noted above, the granting of summary judgment against appellant on each of the counts of his complaint was erroneous. Accordingly, we reverse each of those judgments and remand the case to the trial court for appropriate proceedings.

*So ordered.*