**Howard B. SAMUELS, et al., Plaintiffs,**

v.

**Jack WILDER, et al., Defendants.**

**No. 85 C 5711.**

United States District Court,
N.D. Illinois, E.D.

Oct. 8, 1987.

Supplemental Order on Denial of
Rehearing Dec. 24, 1987.

Reconsideration March 9, 1988.

---

**4.** It is also noteworthy that plaintiff's counsel never requested an extension of time in which to effect service.

James A. Nations, Terence P. Boyle, William R. Fishman, O'Connor & Hannan, Denver, Colo., Stephen C. Shamberg, Brad L. Jansen, C. Elizabeth McCarty, Friedman & Koven, Jeffrey D. Hupert, Norman S. Lynn, James W. Corbett, Joel Teibloom, Shelley R.Z. Barnett, Lynn & Levenstein, Ltd., Chicago, Ill., for plaintiffs.

Randall L. Mitchell, Philip Fertik, Paul E. Lehner, Adams, Fox, Adelstein & Rosen, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

### I

The plaintiffs invested $2,744,000 in oil and gas drilling programs at the solicita-

tion of Wilder, a defendant. Wilder told them of his special tie to Sanguine, Ltd., another defendant, which was a company expert in the oil and gas business. Wilder said to plaintiffs that he and his corporations (defendants Wilder, Inc. and Ansam & Associates, Inc.) would act in plaintiffs' best interests in selecting and making oil and gas investments. Wilder knew plaintiffs had little experience in this sort of business and for his services he collected a fee of $109,760, four percent of plaintiffs' total investment. Plaintiffs tell us Wilder and the other defendants were fiduciaries of the plaintiffs.

Wilder retained complete discretion over the choice of investment prospects and Ansam was to deal with the well operators. Wilder and his corporations would maintain full records of the business and make them available to plaintiffs.

Moreover, Wilder told plaintiffs he would have an interest in each well along with plaintiffs. Wilder and Sanguine agreed to allocate a percentage of each well to Wilder who then allocated a portion of his percentage to Ansam. By agreement a fixed percentage of Ansam's portion went to plaintiffs. Wilder, it was agreed, would have sole authority to decide which percentage of each well he would keep and which he would allocate to Ansam, thereby deciding also what allocation there would be to plaintiffs.

The plaintiffs then say that Wilder did not acquire any interests in wells until after partial drilling occurred and Sanguine told him of the results. This information was concealed from plaintiffs. Wilder insisted that only he have contact with Sanguine in order not to endanger his ties with Sanguine. So, it is said, Wilder had an information advantage before he decided how the percentages of the wells would be allocated. And, it is said, he used this advantage to benefit himself by keeping large percentages of the good wells and giving plaintiffs large percentages of the poor wells.

In short, plaintiffs relied on Wilder, an unfaithful fiduciary, to their detriment in the order of two million dollars or more. Sanguine, which operated nearly all the wells and never furnished an accounting to plaintiffs, knew of Wilder's actions and helped him achieve his goals in exchange for large profits. Further, Sanguine was an issuer of securities under federal law, these securities being the fractional, undivided interests in oil and gas properties.

These actions, the improper allocation of interests in wells, transgressed, the plaintiffs claim, several statutes and legal rules.[1] Before the Court are cross-motions for summary judgment directed to the complaint.[2]

The count seeking a remedy under the Illinois Securities Act, defendants argue, is time barred since the state law provides for recision only where notice of recision is given within six months of the purchaser's acquisition of the information on which his claim is based (here August or September, 1984). Ill.Rev.Stat. ch. 121½, par. 137.13 B (1985); *Buehl v. Dayson,* 127 Ill.App.3d 958, 82 Ill.Dec. 869, 469 N.E.2d 403 (1984). No notice of recision was ever filed, and the complaint in this case, even if it can be construed as such a notice, was not filed until June, 1985. The count seeking relief under section 12(2) of the Securities Act of 1933 is governed by a three year statute of limitations running from the date of purchase (here, at the latest, April 28, 1982), which is more than three years prior to June, 1985. 15 U.S.C. sec. 77m. It is not surprising that "Plaintiffs concede that these arguments have merit...." (Pltfs.' Mem. in Opp. to Defs.' Motion for Partial Summary Judgment.) The Court accepts them.

---

**1.** These are sections 12(2) and 17(a) of the Securities Act of 1933 (Count I); section 10(b) of the Securities Exchange Act of 1934 (Count II); sections 12 and 13 of the Illinois Securities Act (Count III); common law fraud (Count IV); intentional misrepresentation (Count V); fraudulent concealment (Count VI); negligent mis-

representation (Count VII); breach of fiduciary duty (Count VIII); and conversion (Count IX).

**2.** Defendants have also filed a three-count counterclaim, which is the subject of a motion for summary judgment. The counterclaim is not addressed in this opinion.

The remaining statutory foundation for relief under the 1933 Act is section 17(a) and the dispute is whether it gives rise to a private cause of action. The issue has been adequately debated elsewhere. *See In re Washington Public Power Supply System Securities Litigation*, 823 F.2d 1349 (9th Cir.1987) (en banc). Our Court of Appeals has not decided the question.

■ The Fifth and Eighth Circuits, along with the Ninth, have found no private cause of action. *Landry v. All American Assurance Co.*, 688 F.2d 381, 384–91 (5th Cir.1982); *Shull v. Dain, Kalman & Quail, Inc.*, 561 F.2d 152 (8th Cir.1977). I find persuasive the reasoning in *In re Washington Public Power* and *Landry* and accordingly hold that no private cause of action exists under section 17(a). *See also Preston v. Kruezer*, 641 F.Supp. 1163 (N.D.Ill.1986) (Roszkowski, J.); *Beck v. Cantor, Fitzgerald & Co., Inc.*, 621 F.Supp. 1547, 1559–60 (N.D.Ill.1985) (Rovner, J.); *Marino v. Global Investor Securities, Inc.*, [Current] Fed.Sec.L.Rep. (CCH), par. 93,227 at 96,084–085 (N.D.Ill.1986) [1986 WL 15123] (Leinenweber, J.); *Rice v. Windsor Industries, Inc.*, No. 85 C 4196 (N.D.Ill. Feb. 26, 1986) (Plunkett, J.) (LEXIS, Genfed library, Dist. file) [1986 WL 2728]; *Wagman v. FSC Securities Corp.*, [1985–1986 Transfer Binder] Fed.Sec.L.Rep. (CCH) par. 92,445 (N.D.Ill.1985) [1985 WL 2139] (Holderman, J.). Thus the remaining basis for the prayer in Count I disappears.

On the essential elements of the remaining counts, save conversion in Count IX, the defendants' position is simple. They argue that the undisputed facts show they did not intend to favor themselves in allocating well interests, did not have the information necessary to do so, and, in fact, the allocation results do not support plaintiffs' claim.

■ The Court is directed to plaintiff Samuels's deposition, Wilder's affidavit and the affidavit of Arcati, the president of Ansam Associates, Inc. These documents show, in essence, that Wilder's allocation decisions were based upon his tax-planning and cash-flow needs and upon investors' commitments. Ansam's allocations, in turn, were proportional to amounts of investment. Neither Wilder nor Ansam had information sufficient to permit them to predict reasonably the value of the wells when they allocated interests. In fact, Samuels admitted in his deposition that it was not possible to tell whether a well was a good producer until it had been in production for at least "12 months or better." In nearly all cases (71 of 74 wells), allocations were made before any production or sales were had from the well. The results of the allocation show no significant advantage to defendants. The plaintiffs' ratio of productive to nonproductive wells (1.054 to 1) was not significantly bettered by Wilder (1.105 to 1) and was not matched by Ansam (.939 to 1). Finally, Arcati and Wilder aver their lack of intent to favor themselves over plaintiffs.

■ In reply, plaintiffs argue that summary judgment is usually inappropriate on the question of motive, intent or recklessness. Accepting this proposition is of little use to plaintiffs because they do not dispute any of the rest of defendants' arguments. If we assume that defendants' purposes were bad and find they could not and did not fulfill these purposes, the plaintiffs' case for a remedy under 10(b) of the 1934 Act in Count II is lost. Bad intent, without more, is neither tort nor crime.

■ This analysis forecloses the common law fraud, intentional misrepresentation, fraudulent concealment and breach of fiduciary duty counts since they are dependent upon the claim that defendants favored themselves in the allocations. The flaw in plaintiffs' case also affects the negligent misrepresentation count as does the absence there of the claim that defendants were "in the business of supplying information for the guidance of others in their business transactions." *Dixie–Portland Flour Mills, Inc. v. Nation Enterprises, Inc.*, 613 F.Supp. 985, 990 (N.D.Ill.1985). The papers before the Court show defendants are in the oil and gas business not the information business as are brokers, or others. The state law tort of negligent mis-

representation is not meant to apply to all who, as part of the ordinary course of business, convey information to others. State law limits the reach of this tort claim. *See Black, Jackson & Simmons v. Int'l. Business Machines Corp.*, 109 Ill.App.3d 132, 440 N.E.2d 282, 64 Ill.Dec. 730 (1st Dist.1982). The plaintiffs' redefinition of the tort breaches all these limits.

For these reasons Counts I and III are dismissed and judgment is given to defendants on Counts II, IV, V, VI, VII and VIII.

## II

Plaintiffs' final claim for conversion involves interpretation of three similar sets of agreements among the parties, and cross motions for summary judgment have been offered.

The agreements by which plaintiffs implemented in 1981 and 1982 their investments in defendants' oil and gas well operations had a clause indemnifying Ansam. Ansam served as nominee for plaintiffs, i.e., purchaser of plaintiffs' interests in wells. The clause reads:

> The Owner agrees to indemnify the Nominee, his successors, and assigns, and to hold Nominee harmless from all liability, loss, expenses, damages, costs and attorneys fees that Nominee may at any time incur by reason of any type of inquiry, action or suit which may be brought against him or made of him by any person, firm, corporation, or governmental agency or authority or anyone else by reason of the nomineeship.

Another related set of agreements between plaintiffs and Ansam gave plaintiffs:

> The right at any time to inspect Ansam's books with respect to any working interest owned by the participant, upon reasonable notice to Ansam and at a mutually agreed to time.

Plaintiffs paid four percent of their capital investment up front to cover Ansam's costs in performing its obligations, including "all incidental expenses incurred under this Agreement." (Par. 4.) According to paragraph 13, the Participation Agreement and any disputes thereunder shall be governed by the laws of the State of New York.

Plaintiffs allege Ansam did not honor their requests for books, reports, and other documents until August, 1984 when plaintiff Samuels, his attorney and accountant traveled to New York to review documents. Not only was an incomplete sample of documents produced, but in October 1984, Ansam withheld $11,908 from revenue due plaintiffs for expenses incurred in coping with plaintiffs' examination of documents. Ansam did so in reliance upon the indemnification clause. Since this lawsuit was filed Ansam has withheld further amounts in excess of $45,000 from plaintiffs presumably as indemnification for some of the costs of defense here.

Summary judgment is an appropriate device for resolution of issues dependent upon the proper interpretation of an unambiguous agreement.[3] *See, e.g., Davis v. Chevy Chase Financial, Ltd.*, 667 F.2d 160, 169 (D.C.Cir.1981); *Tokio Marine & Fire Insurance Co., Ltd. v. Mc Donnell–Douglas Corp.*, 617 F.2d 936, 940 (2d Cir. 1980); *Water Technologies Corp. v. Calco, Ltd.*, 576 F.Supp. 767, 773 (N.D.Ill.1983).

Plaintiffs offer several reasons why the indemnification rights of Ansam are not applicable here; a few of these reasons are mere makeweights. Public policy, it is said, precludes indemnity for securities fraud violations or intentional wrongdoing. If so, this matters little here because Ansam has now prevailed against all such claims. Plaintiffs say indemnity is not appropriate until liability has been established which has not occurred here. Indeed, a common meaning of indemnification is that the indemnitee has to pay something and does and then the indemnitor makes him whole. Despite this, many, if not most, indemnity agreements today are honored by direct payment by the indemnitor of the amounts due to a third party. But the

---

**3.** Both parties assert that the agreement is unambiguous, although, not surprisingly, their interpretations of the agreement differ.

clause here indemnifies against loss and expense, costs and attorney's fees as well as liability. There is no challenge here to the assertion that the sums withheld were actual expenses for which an obligation to pay had "been established." *Hobbs v. Scorse*, 59 A.D.2d 1037, 399 N.Y.S.2d 783, 784–85 (1977).

Plaintiffs also say that withholding from revenues due them is not expressly authorized by the agreements among the parties. This is true, but neither is withholding prohibited. While this question of Ansam's deductions from revenue distributions is of abstract interest, it is of no moment since the real issue before the court now is whether Ansam is entitled to the money and not how Ansam acquired it.

Finally, plaintiffs assert that the indemnity clause does not apply to lawsuits brought by the indemnitor. The clause, though, contains no such restriction, applying to "any type of ... suit ... brought ... by any person, firm, corporation ... or anyone else." This clause was negotiated by plaintiff Samuels, a lawyer, who apparently drafted the agreements (Samuels Dep. at 7). Samuels apparently was aware that other forms of indemnity provisions were available since an unexecuted draft of another limited partnership agreement in which he considered participation contained a clause precluding indemnity for the indemnitors' lawsuits (Defs.' Mem. in Opp. to Motion for Preliminary Injunction, Exhibit 5 to Exhibit A).

Although it appears there is no New York case law directly on point, the New York courts in construing indemnity clauses have moved away from requiring the parties to explicitly state every possible circumstance to which indemnification will apply. *Levine v. Shell Oil Co.*, 28 N.Y.2d 205, 321 N.Y.S.2d 81, 269 N.E.2d 799 (1971); *Kurek v. Port Chester Housing Authority*, 18 N.Y.2d 450, 276 N.Y.S.2d 612, 223 N.E.2d 25 (1966). Instead the courts look to the intent of the parties as revealed by the clause itself and also consider whether the indemnity provision was part of an arms-length transaction. *Levine*, 321 N.Y.S.2d at 86, 269 N.E.2d at 803.

Thus, the New York Court of Appeals in *Levine* held that a lessor was entitled to indemnification for its own active negligence under a clause providing that lessee "shall indemnify [lessor] against all claims, suits, loss, cost and liability on account of injury or death of persons...." The court reasoned that "the plain meaning of these words fairly includes the liability for the active negligence of [the lessor]" and that no more was required to establish the "unmistakable intent of the parties" to extend indemnification to this situation. *Id.*

Similarly, the clause in this case provides for indemnification against any type of lawsuit brought "by any person, firm, corporation, ... or anyone else...." We find that "the plain meaning of these words fairly includes" suits brought by the indemnitor, and plaintiffs' arguments to the contrary are unpersuasive. As we have noted, the indemnity provision was negotiated by plaintiff Samuels, a lawyer, who apparently was aware that other types of indemnity provisions were available. As in *Levine*, if Samuels "had reservations as to the scope of the agreement, he should have insisted on a different indemnification clause or refused to give his assent to the contract." *Id.*

A more difficult challenge to Ansam's use of indemnity is the argument that the clause covers only actions arising "by reason of the nomineeship." The nominee's sole function, say plaintiffs, was to hold title to plaintiffs' assets and to act as plaintiffs' nominee or representative in the commercial development of those interests. The clause does not appear in the separate participation agreements which were the agreements giving Ansam discretion to allocate well interests. The defendants reply that both agreements are "logically and practically integral" to each other. The court agrees. The participation agreements depend upon Ansam's ability to act as nominee and they require that the nominee agreements be executed. Under these participation agreements Ansam's actions are taken "by reason of the nomineeship" and are protected by the indemnity clause. Thus the expenses of defending this lawsuit are covered by the clause, and there has been no conversion.

■ This leaves only the matter of the $11,908 withheld to cover the pre-lawsuit examination by plaintiffs of Ansam's books and records. The right to examine is explicit in the agreement. Plaintiffs argue that the costs of the examination were expenses incidental to Ansam's performance of its duties for which it had been paid its fee of four percent of the investment. Ansam tells us these costs were extraordinary, not incidental. The papers before the Court demonstrate that nothing more occurred than the examination of records called for in the agreements. A fair reading of the contracts between the parties is that the costs to Ansam in connection with the examination were the costs it was to sustain from the fees it had been paid. Plaintiffs are entitled to $11,908 along with appropriate interest.

For the reasons stated above, Counts I and III of Plaintiffs' complaint are dismissed. On Counts II and IV–VIII judgment is awarded to defendants as is judgment on Count IX except to the extent of $11,908, plus interest, for which judgment is awarded to plaintiffs.

## SUPPLEMENTAL ORDER ON DENIAL OF RECONSIDERATION

In a Memorandum Opinion and Order dated October 8, 1987, we granted defendants' motion for summary judgment on Counts II, IV, V, VI, VII, VIII and IX of plaintiffs' complaint (except to the extent of $11,908.00 plus interest awarded to plaintiffs on Count IX).[4] Before the Court is plaintiffs' motion to reconsider that Order. The motion is denied.

Plaintiffs offer two reasons for reconsideration. First, plaintiffs argue that the Court did not consider facts revealed during late stages of discovery which prompted plaintiffs to seek leave to file a second amended complaint. Much of the briefing, both on the cross-motions for summary judgment and on the motion for reconsideration, is directed to this issue. The simple fact is that these allegedly newly discover-

ed facts were never, and are not now, properly before the Court. Plaintiffs withdrew their motion for leave to file the second amended complaint on December 8, 1986, during proceedings before Judge Marshall.[5] Plaintiffs repeatedly assert that during those proceedings, Judge Marshall told plaintiffs that he would consider, in ruling on the then-pending motions for summary judgment, a Local Rule 12(e) statement of facts incorporating the allegations in the withdrawn second amended complaint. This is not so.

The transcript of the proceedings before Judge Marshall reveals that the Judge refused to allow plaintiffs to respond to defendants' motion for summary judgment by filing a second amended complaint. He then made some general comments concerning motions for summary judgment. He stated:

Now, I do not believe that an amended complaint is an appropriate response to a motion for summary judgment.

Motions for summary judgment are based upon evidentiary facts or uncontested facts, one of the two. And the cases are legion that the allegations of the complaint do not avoid a summary judgment.

If the evidentiary materials submitted by the moving party are sufficient, you penetrate the pleadings.

Now, I'm just not going to permit you to step aside and plead a different case.

Tr. at 4. Later, Judge Marshall granted plaintiffs ten days to file a Rule 12 statement in opposition to defendants' motion for summary judgment. Tr. at 7. Clearly, the Judge did not state or imply that this Rule 12 statement should include the facts supporting plaintiffs' withdrawn second amended complaint. Defendants' motion for summary judgment directed to the first amended complaint had already been filed. Judge Marshall refused to allow plaintiffs to file a second amended complaint because plaintiffs sought thereby to "plead a different case." Tr. at 4. Simply put, it would make no sense for the Judge to then allow

---

4. We also dismissed Counts I and III of plaintiffs' complaint; these dispositions are not challenged.

5. This case was reassigned to this Court's docket in June 1987.

plaintiffs to oppose the motion with facts alleged in the second amended complaint set forth in a paper styled a Rule 12 statement. Plaintiffs' first ground for their motion to reconsider is meritless.

Plaintiffs' second ground for reconsideration is that the interpretation of the indemnity clause turned on disputed, ambiguous language. In making this argument, plaintiffs have taken a 180 degree turn from their prior position on the indemnity clause. As defendants correctly point out, in cross-moving for summary judgment on the conversion claim, plaintiffs maintained that there is no genuine issue of material fact (Cross Motion at par. 3, Cross Mem. at 19), that the clause is unambiguous (Cross Mem. at 7, 8, 19), and that its interpretation "is a matter of law to be decided by the judge" (Cross Mem. at 7). Plaintiffs cannot now, having lost on this issue, complain that summary judgment should not have been entered because the clause is ambiguous and its interpretation must be decided by a jury.

For the foregoing reasons, plaintiffs' motion for reconsideration is denied.