2200 M STREET LLC, Millennium Partners LLC, Millennium Partners Management, LLC and Millennium Manager I, Inc., Appellants,

v.

Cheryl H. MACKELL, Thomas J. Mackell, Barbara McLeod, Elwood Bruce McLeod, Pauline Johnson–Brown, Lara Michelle Brown, and Angela Foster, Appellees.

Nos. 04–CV–550, 04–CV–587, 04–CV–552, 04–CV–586.

District of Columbia Court of Appeals.

Argued May 10, 2005.

Decided Dec. 31, 2007.

Renu M. Setaro for appellants. Judith A. Miller, Laurie S. Fulton, William J. Bachman, John L. Cuddihy, Joseph A. McManus, Jr., and Geoffrey T. Keating were on the brief for appellants.*

David Hilton Wise, with whom Daniel J. Bender, James A. Allen, and Daniel K. Bryson were on the brief, for appellees Cheryl H. Mackell, Thomas J. Mackell, Barbara McLeod, Elwood Bruce McLeod and Angela Foster, Nos. 04–CV–550, 04–CV–552 and 04–CV–587.

Johnathan K. Tycko, Washington, with whom Steven A. Skalet was on the brief, for appellees Lara Michelle Brown and Pauline Johnson–Brown, No. 04–CV–586.

Before WASHINGTON, Chief Judge,** RUIZ, Associate Judge, and SCHWELB, Senior Judge.***

RUIZ, Associate Judge:

The various appellees, who are all owners of condominium units in a building built and managed by appellants,[1] brought separate suits against appellants. They claim that defective construction of the building (specifically, utilities of the building including plumbing, ventilation, heating, air conditioning, and roofing) has caused the flooding of several condominium units, resulting in water damage to their units, personal health problems from eventual toxic mold growth throughout the building and in their individual units, and a decline in the resale value of their units as a result of the "negative publicity" the building has received. The suits claim fraud and misrepresentation in the sale of the units, breaches of warranty and of contract, tort liability based on intentional and negligent conduct as well as strict liability, and violation of the D.C. Consumer Protection Act, see D.C.Code § 28–390 et seq. All seek compensatory damages for personal injury and property loss, punitive damages, statutory treble damages, attorney fees and costs. All asked for a jury trial of their legal claims. Appellees Johnson–Brown and Brown also request injunctive relief to prevent what they allege are appellants' consumer fraud; the Mackell appellees seek equitable relief in the form of rescission of the purchase of their condominium unit.

■ Appellants filed motions in each case asking the Superior Court to compel arbitration, based on agreements entered into by appellees at the time of purchase that, appellants argued, mandate that appellees' claims be resolved through arbitration. The trial judge denied these motions, concluding that the contractual provisions relied on by appellants did not require arbitration of the claims at issue

---

* Following oral argument, the court granted the motion of Ms. Miller, Ms. Fulton, Mr. Bachman, Mr. Cuddihy, Mr. McManus and Mr. Keating to withdraw as counsel for appellants.

** Chief Judge Washington was an Associate Judge of the court at the time of argument. His status changed to Chief Judge on August 6, 2005.

*** Judge Schwelb was an Associate Judge of the court at the time this case was argued. His status changed to Senior Judge on June 24, 2006.

1. Though each appellant is a separate legal entity, they appear to be related entities, and have defended these actions collectively throughout this dispute. They will therefore be referred to in the collective in this opinion.

in appellees' lawsuits. Appeals have been taken from the Superior Court's denial of appellants' motions to compel arbitration,[2] which we affirm as to all appellees, except the Mackells, which we affirm in part, and reverse in part.[3]

## I.

Beginning in 1999, each of the appellees committed to buying a condominium residence in the building which was to be constructed and managed by appellants on the block bounded by 22nd and 23rd Streets, and L and M Streets, N.W., to be known as The Residences at the Ritz Carlton in Millennium Square. The building was affiliated with the Ritz–Carlton hotel chain, and promised the purchasers, in the words of the complaint filed by appellees Johnson–Brown and Johnson, "the new upper limit of refinement"; and in the Mackell appellees' complaint, as "the highest quality, most luxurious building in Washington, D.C."; or, to quote Irving Berlin, as a place "where fashion sits."[4] At the time appellees committed to purchasing their condominium units, they signed a standard Purchase Agreement, prepared by appellants, that provides in Paragraph 5(a):

> *Declarant's [Appellants'] Obligations:* At settlement, [appellants] shall deliver the Unit and the appurtenances thereto substantially in accordance with the Plats and Plans, as the same may be modified and amended from time to time, with all fixtures, appliances, and equipment to be provided by [appellants]. Purchaser [appellee] acknowledges that measurements shown on the preliminary Plats and Plans are approximate and actual dimensions may not be exactly as shown. [Appellants] shall not be required to install or provide any fixtures or appliances not actually installed in the Unit at the time of inspection pursuant to Section 6 or otherwise agreed in writing to be installed by [appellants]. [Appellants] shall have the right to make nonmaterial changes in the dimensions of any portion of the Condominium and to substitute substantially equivalent materials for any of the same set forth in any sales or other documents and to make such modifications or substitutions as may be required by any governmental authorities asserting jurisdiction over the Condominium or any construction or permanent lender or as may be reasonably necessary. *Any dispute involving delivery of the Unit in accordance with the Plans shall be submitted to Gary E. Handel & Associates, the project architect for a decision, which decision shall be binding.*

(Emphasis added.)

Appellees took delivery and possession of their respective condominium units in late 2000 or early 2001. At closing, a Certificate of Limited Warranty was deliv-

---

**2.** An order denying a motion to compel arbitration is a final, appealable order, *see* D.C.Code § 16–4317(a)(1); *Umana v. Swidler & Berlin,* 669 A.2d 717, 723 (D.C.1995); *Woodland Ltd. P'ship v. Wulff,* 868 A.2d 860, 863 (D.C.2005) and this court therefore may exercise jurisdiction over this matter pursuant to D.C.Code § 11–721, granting jurisdiction over appeals from all final orders and judgments of the Superior Court of the District of Columbia.

**3.** One of the consolidated appeals, *2200 M Street, LLC v. Lucy H. Labson,* No. 04–CV–551, was dismissed by the court at the request of the parties by order entered May 26, 2005.

**4.** *See* IRVING BERLIN, PUTTIN' ON THE RITZ (Irving Berlin Corp.1929).

ered by appellants to the purchasers.[5] The Certificate recites that it "describes Declarant's [appellants'] obligations under District of Columbia Code Section 47–1856 [now § 42–1903.16 of the Condominium Act] to make adjustments to your Residential Unit . . ." In relevant part, Section I.A. of the Certificate guarantees:

A. Non–Consumer Products and Non–Consumer Goods–Structural Defect.

1. Declarant [Appellants] will correct any structural defect, which shall be those defects in components constituting the Unit which reduces the stability or safety of the Unit below standards commonly accepted in the real estate market or restricts the normal intended use of all or part of the Unit and which requires repair, renovation, restoration or replacement, provided the defect occurs and is brought to [appellants'] attention in writing within two years from the Effective Date.[6]

2. A judicial proceeding for breach of any obligation arising under paragraph one above must be commenced within five years after the date the warranty period begins.

Section V ("Warranty Procedures") spells out the procedures by which unit owners are to report covered structural defects in order "to permit maximum efficiency in administering work under warranty." First, each unit owner is given the "oppor-

tunity to inspect his Unit prior to settlement," and, at that time, should he or she discover any "incomplete items" or "defects readily visible to the human eye," the owner is to list them on the "Pre–Settlement Inspection Form." In addition, the warranty also provides procedures for addressing structural defects discovered after the owner takes delivery of the unit. Upon discovery of such defects, the unit owner must first send a written statement of claim to appellants, at which time a representative of the building would meet with the unit owner to collaboratively prepare a list of defects on a Warranty Inspection Form,[7] which is to be signed by both the unit owner and the representative of the building. Section V.B. governs disputes as to whether a claimed defect should be listed on the Inspection Form,[8] and provides:

If the Unit Owner and the [appellants'] representative fail to agree upon the defects to be noted on the Warranty Inspection Form or the workmanlike correction of such defects, [appellants] will, within five days after the date of the Unit Owner's request therefor, *submit the disagreement to Gary E. Handel & Associates (the "Project Architect") for decision, and such decision shall be final and binding on the [appellants] and the Unit Owner.* The Project Architect will render his decision based on

---

5. The Certificate of Limited Warranty is referred to in Paragraph 16, "Warranties" of the Purchase Agreement, which recited that the Certificate was "attached as exhibit[] to the Public Offering Statement."

The Mackell appellees received an Amended and Restated Certificate of Limited Warranty. That Certificate contained a broader warranty, which we discuss *infra.*

6. The "Effective Date" of the Limited Warranty was the date of closing.

7. Once a defect is jointly listed on the Warranty Inspection Form, appellants are obligated to correct it, as section V.C. of the warranty provides that "[t]he signature of the [appellants'] representative on the Warranty Inspection Form constitutes agreement by the [appellants] to complete in a workmanlike manner all items noted on such form. Work shall start promptly and be carried on expeditiously by the [appellants]."

8. The same provision applies to the "Pre–Settlement Inspection Form."

the Public Offering Statement, the Condominium Instruments, the standard in the trade, the Warranty Inspection Form and the Purchase Agreement. (Emphasis added.) The warranty procedures also extend to "any latent defects that may be discovered subsequent to the completion of the Warranty Inspection Form," but provides that these claims "will be handled individually upon written notice being sent" by the unit owner to appellants.

According to the complaints filed in the various cases between mid–2002 and early 2004, the completed Ritz building was anything but what Irving Berlin would have praised as "super-duper." *See* note 4, *supra*. Plaintiffs allege that appellants hurried completion of the construction project in order to open the hotel in time for the President's Inauguration in 2001, and, as a result, a substandard building was constructed.[9] In particular, they allege that because of the shoddy construction, the water and sewage systems of the building failed at various times, causing floods and other backups in these systems. The flooding, in turn, caused water damage as well as eventual harmful toxic mold growth in the building and in individual units. Each of the appellees brought suit against appellants, predicated on claims of fraud, negligence, breach of implied warranties, breach of statutory warranties, breach of contract, strict liability, and violations of the District of Columbia Consumer Protection Act.[10] In each case, appellants sought to compel arbitration, arguing that Paragraph 5(a) of the Purchase Agreements entered into by appellees contained a binding arbitration clause, mandating that the claims be resolved through arbitration before the project architect. Denying the requests to compel arbitration, the trial court noted that although "arbitration is a favored way to resolve disputes," arbitration may not be compelled unless the agreements between the parties "clearly provide for such an alternative dispute resolution." Relying on Paragraph 21 of the Purchase Agreement,[11] the trial court concluded that Paragraph 5(a) was extinguished once the parties went to settlement, and that

9. At the time of argument, the cases had not advanced to the pre-trial discovery stage due to the trial court's stay of proceedings on June 9, 2004 upon the filing of these appeals, and the plaintiffs' averments were just that, factual matters which must be proven at any future proceeding. Indeed, we express no view on the merits of any of appellees' claims, nor need we, as the evaluation of whether a given dispute is required to be arbitrated is an inquiry which does not consider the merits or bona fides of the dispute. *See* D.C.Code § 16–4302(e).

The court was recently informed by the trial court, Judge Brook Hedge, that in light of another lawsuit filed in Superior Court by appellants (*2200 M Street, LLC v. Bovis Lend/Lease*, No.2005 CA 8727B, filed November 3, 2005), that is set to go to trial in late February of 2008, as well as another case filed in the U.S. District Court for the District of Columbia (*Murphy v. 2200 M Street LLC*, No.2004 CA 346, filed March 3, 2004), both of which raise issues similar to the one underlying these appeals, the previously-imposed stay was lifted and pre trial discovery ordered to proceed as set out in the judge's order. Neither the original order staying discovery or the order lifting the stay is before us in these appeals.

10. Not every listed cause of action was pled in every complaint.

11. Paragraph 21 of the Purchase Agreement reads:

Notwithstanding anything to the contrary herein, acceptance of the deed at settlement shall constitute Purchaser's acknowledgment of full compliance by Declarant with the terms of this Agreement. The terms hereof shall be merged into and extinguished by delivery of the deed at settlement except for Sections 4, 16, 17, 20, 21 and 22 which shall survive delivery of the deed and shall not be merged therein.

the "purpose" of that paragraph "was to resolve the usual 'punch list' types of issues that can arise at a walk through or pre-settlement inspection immediately prior to settlement or such other matters that were immediately visible to the parties." As a result, the trial court concluded, the Purchase Agreement did not "require[] arbitration for deficiencies that were not apparent at the time of the pre-settlement inspection of the premises," and, therefore, did not address the claims raised in the complaints before the court.

Appellants have taken a timely interlocutory appeal from the trial court's denial of their motions to compel arbitration, see note 2, *supra*, and we have consolidated these cases on appeal.[12]

## II.

Appellants claim that two clauses, Paragraph 5(a) of the Purchase Agreement and Section V.B. of the Certificate of Limited Warranty, contain arbitration agreements such that the presumption in favor of arbitration requires that the claims made by appellees must be resolved through arbitration and not in a judicial forum. Appellees respond, first, that because the clauses do not use words such as "arbitration," they do not clearly provide that disputes are to be settled through the arbitral process. Second, they argue that the selection of the project architect as arbitrator vitiates any arbitration agreement, because this architect has a close relationship to appellants, and is not an independent and neutral decision-maker. Lastly, appellees argue that these clauses cover only a small number of disputes and that the claims raised in their complaints lie outside their limited scope. Although we interpret

the clauses cited by appellants as mandating arbitration of some disputes, we conclude that the claims made by appellees (except the Mackells) do not fall within the limited purview of those clauses, and we hold that appellees have not agreed to submit the instant disputes to arbitration. Therefore, although we do not adopt the trial judge's reasoning in its entirety, we affirm the trial judge's denial of appellant's request to compel appellees McLeod, Foster, Johnson and Johnson–Brown to arbitration and remand their cases so they can proceed to litigation.[13] We reverse in part, however, with respect to the Mackell appellees, whose warranty claims are covered by the more broadly-worded Amended and Restated Certificate of Limited Warranty.

### A. Agreement to Arbitrate

■■■ Mandatory arbitration is essentially enforcement of a contract between the parties, whereby they have agreed that disputes between them will be resolved in an arbitral, and not judicial, forum. *See* D.C.Code § 16–4301 (declaring in the D.C. Uniform Arbitration Act ("DCUAA") the enforceability of written agreements to arbitrate present or future disputes). Because arbitration becomes mandatory only by mutual consent of the parties, there must be an agreement between them— interpreted and governed by normal principles of contract law—which provides for arbitration. *See Davis v. Chevy Chase Fin. Ltd.*, 215 U.S.App. D.C. 117, 122, 667 F.2d 160, 165 (1981) ("Arbitration is . . . a matter of contract, and the contours of the arbitrator's authority in a given case are determined by reference to the arbitral agreement."). Hence, "where a party challenges the arbitrability of a dispute,

12. The cases were not consolidated in the trial court, but the responsive pleadings and the trial judge's orders in each case are, for the most part, virtually verbatim.

13. As noted earlier, the trial court has already lifted the stay that had been imposed on pre-trial discovery.

... the court must first settle the basic contractual question" of whether they have agreed to submit their dispute to arbitration. *Woodland Ltd. P'ship*, 868 A.2d at 864; *see Grad v. Wetherholt Galleries*, 660 A.2d 903, 908 (D.C.1995) (noting that because "[u]nder the DCUAA, the arbitrator's authority derives from the consent of the parties," a party objecting to arbitration may "seek judicial determination of the scope of consent either before, during or after an arbitration."). "In making that determination, we apply state-law principles applicable to the formation of contracts." *Lopata v. Coyne*, 735 A.2d 931, 936 (D.C.1999).

▮ Because "agreement to have third parties decide disputes [is] the essence of arbitration[, n]o magic words such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed to obtain the benefits of [an arbitration clause]." *AMF Inc. v. Brunswick Corp.*, 621 F.Supp. 456, 460 (E.D.N.Y.1985). Here, although neither Paragraph 5(a) of the Purchase Agreement nor Section V.B. of the Certificate of Limited Warranty uses the word "arbitration" or any synonym, these two clauses are unquestionably agreements to arbitrate, as both direct that the resolution of certain disputes is to be decided by a third party, the project architect (and, in the case of the Amended and Restated Certificate, an identified engineering services firm). Thus, we hold that there was an agreement between these parties to arbitrate some disputes. *See id.* ("If the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration.").

▮ The key issue for this court's resolution is whether the present disputes—namely, actions for injunctive relief and for damages resulting from property and personal injury, sounding in tort, in contract and under D.C. statutory law

stemming from the alleged latent defects in the construction of the building housing the Ritz Residences—fall within the ambit of these arbitration clauses. "Upon a finding of the existence of an enforceable arbitration clause, a presumption in favor of arbitration attaches." *Lopata*, 735 A.2d at 936. This presumption "is essentially a generalized inference of the parties' intent; courts will presume that an arbitration clause agreed upon by the parties was intended to foreclose judicial involvement in their disputes." *Friend v. Friend*, 609 A.2d 1137, 1139 (D.C.1992). On the other hand, because "arbitration is a matter of contract[,] . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). In navigating the gulf between the judicial presumption in favor of arbitration that derives from the existence of an agreement to arbitrate, and the reluctance to force an unwilling party into unconsented arbitration, the Supreme Court has counseled:

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*AT & T Techs. v. Commc'ns Workers*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers*, 363 U.S. at 582–83, 80 S.Ct. 1347); *accord Carter v. Cathedral Ave. Coop., Inc.*, 566 A.2d 716, 717 (D.C.1989). Therefore, the presumption in favor of arbitration arises only

when the court has found that the parties have agreed to submit *some* disputes to arbitration. *See AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415. If the arbitration clause can reasonably be interpreted as including the dispute at hand, the presumption—unless rebutted—will lead the court to order it to be resolved through arbitration, and it is precisely in cases where the court must interpret an ambiguous clause that the presumption becomes operative. *See Masurovsky v. Green*, 687 A.2d 198, 202 (D.C.1996). On the other hand, if the court has "positive assurance" that the parties did not intend the dispute *sub judice* to be resolved through arbitration, then the court may not compel arbitration, because to do so would be contrary to the parties' agreement. *See AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415; *Steelworkers*, 363 U.S. at 582–83, 80 S.Ct. 1347; *Davis*, 215 U.S.App. D.C. at 122, 667 F.2d at 165 ("Parties to such an agreement cannot be required to submit to arbitration any matter that they did not agree would be subject to that manner of dispute resolution."). Determining the scope of an agreement to arbitrate, like other issues of contract interpretation, is one that this court undertakes *de novo. Masurovsky*, 687 A.2d at 202 (citing *Haynes v. Kuder*, 591 A.2d 1286, 1289 (D.C.1991)).

### B. Scope of the Agreement to Arbitrate

#### 1. Paragraph 5(a) of the Purchase Agreement.

█ Under paragraph 5(a) of the Purchase Agreements signed by the parties, appellants guaranteed that the condominium units would be "substantially in accordance with the Plats and Plans," but not necessarily in exact compliance therewith, as "nonmaterial" changes could be made to the "Plans," "as the same may be modified from time to time" and "as may be required by any governmental authorities asserting jurisdiction over the Condominium or any construction or permanent lender or as may be reasonably necessary." [14] This paragraph requires that all disputes "involving delivery of the Unit in accordance with the Plans" be arbitrated, *i.e.* submitted to a third party—the project architect—for binding resolution.[15]

Appellants' argument that this paragraph mandates arbitration of the present claims depends on a reading of the "Plans" mentioned in the arbitration clause as including the "*construction* plans" for the building. From this premise, they argue that the installation of the utilities of the building—water, HVAC, and the like—are governed by blueprints and other "construction plans," and as the gravamen of the various lawsuits rests on whether those systems in the building were properly constructed, Paragraph 5(a) of the Purchase Agreement requires that these claims be arbitrated. Appellees respond that Paragraph 5(a) applies only to disputes over whether the building and the specific unit purchased is in substantial compliance with the "Plats and Plans," which refers to official documents showing the location and boundaries of the building

---

**14.** Paragraph 5(a) also warrants that "fixtures, appliances and equipment" are to be as "set forth in sales or other documents," subject to substitution with "substantially equivalent materials," but does not expressly mention disputes relating to these items in the last sentence referring disputes to the project architect. As the complaints do not make any claims with respect to these items, we do not address whether they are covered by the arbitration clause.

**15.** "Any dispute involving delivery of the Unit in accordance with the Plans shall be submitted to Gary E. Handel & Associates, the project architect for a decision, which decision shall be binding."

and of specific condominium units within the building, and that the arbitration clause in Paragraph 5(a) pertains solely to disputes as to differences between the location, layout and size of the units they purchased as promised and as delivered.

The first level of analysis is a plain meaning interpretation of Paragraph 5(a) of the Purchase Agreement. The Purchase Agreement does not itself refer specifically to construction plans nor does it define the term "Plans" used in the arbitration clause. But Paragraph 1(a) of the Purchase Agreement provides that "[c]apitalized terms not defined herein shall have the meanings specified for such terms in Section 45–1802 of the Condominium Act," which has since been re-codified without change as D.C.Code § 42–1901.02 (2001). The Condominium Act defines "Condominium instruments" as "the declaration, bylaws, and *plats and plans,* recorded pursuant to the provisions of this chapter." D.C.Code § 42–1901.02(5) (emphasis added). The Act further defines the "plat" and "plan" as official documents to be recorded, which "survey ... the location and dimensions" of the real property on which the condominium building structure is located and "shall show the location and dimensions of the vertical boundaries of each unit" within that structure. D.C.Code § 42–1902.14(a) & (b). The term "Unit," also defined in the Act, means "a portion of the condominium designed and intended for individual ownership." D.C.Code § 42–1901.02(30). The Plats and Plans of the Ritz Residences which are in the record show the building's location on the relevant piece of property, and also show, floor by floor, each unit's location and boundaries within the building (in building terms, the "footprint" of the building and of each unit). These docu-ments meet precisely the meaning of "plat" and "plan" as defined in the Condominium Act.[16] Because the contract between the parties adopts the definition of terms in the Condominium Act, which narrowly defines the term at issue, appellants' assertion that the term "Plans" used in the arbitration clause of the Purchase Agreement broadly means "construction plans" such as blueprints and the like, is not supported by the contractual documents.

██ Furthermore, the choice of a person with specialized expertise—in this case, the project architect—as arbitrator is further evidence that the arbitration required by Paragraph 5(a) is limited to a narrow and specialized category of disputes, namely those which fall within the professional expertise of an architect. *See, e.g., McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.,* 858 F.2d 825, 828 (2d Cir.1988) (holding that parties' agreement requiring that disputes over the computation of indemnity to be paid be submitted to "a tax counsel," supported a "conclusion that the effect of the clause should be limited to tax law questions and computations disagreements"). Paragraph 5(a) deals with a guarantee that the condominium units will be delivered in substantial compliance with the "Plats and Plans" recorded pursuant to the Condominium Act and will be of essentially the same square footage, configuration and location as promised, subject to slight modifications as construction and regulatory contingencies warrant. It is in the specialized expertise of an architect to decide such issues. But the broader issues raised in appellee's complaints, such as negligence, fraud, misrepresentation and breach of statutory duties related to the construction of the building, and the availability of equitable relief (rescission) or the extent of compen-

---

**16.** These documents make no mention of the internal workings of the building, such as the water and sewage systems, and do not include blueprints or other "construction plans."

sable damages for personal injury and property loss, are not within an architect's usual expertise. Moreover, although the chosen arbitrator's relationship to a party does not automatically nullify a valid agreement to arbitrate, *see Aviall, Inc. v. Ryder Sys. Inc.*, 110 F.3d 892, 896 (2d Cir.1997), the identity of the arbitrator may shed some light on the parties' intent as to the scope of their agreement. Here, for example, if the construction plans themselves are challenged (*e.g.*, on a theory of negligent design), the project architect would be an inherently unsuitable arbiter of that dispute, as he is the person responsible for those plans.

We hold that the plain reading of Paragraph 5(a) of the Purchase Agreement, including the definitions of the relevant terms ("Plats and Plans") found in the Condominium Act incorporated by reference in the arbitration clause, as well as the inference to be drawn by the appointment of the project architect as arbiter, compels the conclusion that the parties agreed to arbitrate only those disputes which concern the "Plats and Plans," *e.g.*, the location of the unit inside the building, or disputes as to the configuration or size

of the units. Because this is the only reasonable reading of the parties' agreement, it is inappropriate to employ the presumption in favor of arbitration in this case, as arbitration "is a way to resolve those disputes—but only those disputes— that the parties have agreed to submit to arbitration." *First Options v. Kaplan Investments, Inc.*, 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *see Masurovsky*, 687 A.2d at 205; *Steelworkers*, 363 U.S. at 582–83, 80 S.Ct. 1347. And because the arbitration clause is so limited by its terms, we can say with "positive assurance," *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415, that it does not apply to other disputes such as those contained in appellees' complaints.[17]

### 2. Section V.B of the Certificate of Limited Warranty[18]

■ Appellants also maintain that Section V.B of the Certificate of Limited Warranty issued to each unit owner at the time of settlement also contains an arbitration clause that, with the presumption favoring arbitration, should be read to include the present disputes.[19] See *supra* at pp. 147–48

---

17. Appellees filed a motion for summary affirmance, bringing to our attention an unpublished two-page opinion of the U.S. Court of Appeals for the D.C. Circuit affirming the U.S. District Court's denial of appellants' motion to compel arbitration in what appears to be a similar suit filed by other unit owners against these same appellants. Characterizing the complaint filed in federal court as alleging that "plumbing in Millenium Square suffered from a defect that gave rise to an infestation of toxic mold throughout the building," the court held that "the Plans do not mention plumbing at all." *2200 M Street LLC v. Murphy*, 173 Fed.Appx. 838 (D.C.Cir.2005). As the D.C. Circuit did not consider the Certificates of Limited Warranty we discuss *infra*, we did not grant appellees' motion for summary affirmance based on the federal appellate court's opinion.

18. The record contains three Certificates of Limited Warranty Issued to appellees Foster, McLeod and Johnson–Brown, and an Amended and Restated Certificate of Limited Warranty issued to the Mackell appellees. The Condominium Act requires that a "Declarant" (usually the first person or entity to sell a condominium unit) warrant against "structural defects" for two years from the date of sale. *See* D.C.Code § 42–1903.16. All of the Certificates provide that "nothing contained herein shall be deemed to be in derogation" of the warranty required by the Act.

19. Appellees contend that we should not consider this argument because appellants did not rely on this provision when they moved in Superior Court to compel appellees to arbitration and because appellees did not sign the Certificates. But appellants mentioned (al-

and 148–49. Though this clause similarly mandates the arbitration of certain disputes—as does Paragraph 5(a) of the Purchase Agreement—we again can say with positive assurance that the cases presently before us fall outside its limited scope.

Under the terms of the Certificate of Limited Warranty, when a "structural defect" (defined in the Certificate as "those defects in components constituting the Unit which reduces the stability or safety of the Unit below standards . . . and which require[] repair, renovation, restoration or replacement") is discovered by the unit owner, it is incumbent upon the owner to notify a named representative of the building, who will then inspect the claimed defect. *See* Certificate Section V.A.(1). If both the building's representative and the unit owner agree that there is a defect covered by the warranty, then the defect is listed on the Warranty Inspection Form, signed by both, *see* Certificate Section V.A.(2), and the warrantor becomes obligated to correct any defect listed on the form "in a workmanlike manner, and consistent with standards applicable to a luxury Condominium." Certificate Section V.C. If the unit owner and the building representative are unable to agree on whether the defect is to be listed on the form, however, upon the unit owner's request made within five days to the building representative, the dispute is submitted to the project architect, who has final say over whether the claimed defect is covered by the warranty. Certificate Section V.B. The warranty, as written, envisions that this procedure is to be followed with respect to claims made at the time of pre-settlement inspection by use of a "Pre-Settlement Inspection Form," as well as post-settlement, by following a similar procedure using a "Warranty Inspection Form," which are attached as exhibits to the Certificate. Certificate Section V.A.(1) and (2). The Certificate also provides that "certain items covered by this warranty may arise from time to time, as is normal in a new building," Certificate Section V.A., including "[a]ny latent defects that may be discovered subsequent to the completion of the Warranty Inspection Form" during the two-year warranty period, which are to be handled "individually." Certificate Section V.A.(3).

By its terms, the purpose of the Certificate of Limited Warranty is to set out appellants' obligations to "make adjustments" to the purchaser's specific unit under the warranty required by the Condominium Act, D.C.Code § 42–1903.16, and expressly covers only "defects in components constituting the Unit." Certificate Section V.A. Under the Condominium Act, a "Unit" includes "all space, interior partitions, and other fixtures and improvements within [its] boundaries." D.C.Code § 42–

beit briefly) the arbitration clause of the Certificates in their reply to appellees' opposition to compel their motion to arbitration. And although the trial judge did not base her ruling on the Certificates, she did quote the relevant language from the certificates and discussed the certificates in her order, and at least impliedly determined that they did not provide a basis for arbitration. Moreover, appellees have had an opportunity to respond to appellants' argument in their briefs and at oral argument. *See District of Columbia v. Helen Dwight Reid Educ. Found.*, 766 A.2d 28, 33–34 n. 3 (D.C.2001) ("The principle that 'normally' an argument not raised in the trial court is waived on appeal is . . . one of discretion rather than jurisdiction.'").

On the issue of signatures, although the Certificates in the record are not signed by appellees, they are referred to in Paragraph 16 of the Purchase Agreements that appellees did sign. Moreover, appellees invoke the Certificate of Limited Warranty and their complaints seek to enforce its warranty. Therefore, we consider and decide whether appellees' claims are covered by the arbitration provision in the Certificate of Limited Warranty.

1902.06(4). The gravamen of appellees' complaints filed in each of the cases, however, extends well beyond particular defects in components within appellees' individual units and allege deficiencies in the building's systems and construction of the edifice as a whole, even though each plaintiff alleges particularized harm to his or her individual condominium unit or person. For example, all plaintiffs claim that they have been exposed to harmful mold spores, including from toxic mold in some of the individual units. The complaints allege, however, that mold pervades the entire building and that its source, though unknown to appellees, is likely from deficiencies in the water and sewage system of the entire building, not in their particular units. Moreover, while the McLeod appellees allege water damage to their unit, they claim that the cause of the water damage is not a component in their unit, but rather an improperly installed washing machine hose in the unit directly above theirs. But except for the Certificate issued to the Mackell appellees (which we consider separately) defects in other units are not covered by the Certificate of Limited Warranty issued to each individual appellee, as owner, for "those defects in components constituting" their particular unit. Certificate Section V.A. Defects in the common elements are covered by a similar Certificate of Limited Warranty that was issued not to these individual unit owners (except the Mackells), but to the Residential Association of the building.[20] As the instant cases concern alleged defects elsewhere in the building, or "macro" defects to the entire building, of which manifestations in the individual unit are but a part of a larger harm, we can say with "positive assurance" that these disputes lie outside the narrow ambit of the arbitration clause found in the Certificate of Limited Warranty issued to appellees McLeod, Foster, Johnson and Johnson–Brown, which covers structural defects discovered in their units or the components constituting their unit. As a result, the arbitration provision in the Certificate of Limited Warranty does not obligate appellees to resolve their pending claims through arbitration. *See AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. 1415; *Steelworkers*, 363 U.S. at 582–83, 80 S.Ct. 1347.

## C. Amended and Restated Certificate of Limited Warranty—the Mackell Appellees

■ We reach a different result with respect to the Mackell appellees, who, as noted, received an Amended and Restated Certificate of Limited Warranty.

Although the procedure for noting defects and the arbitration provision in Section V of the Mackells' Certificate is similar to that we have just discussed in the Limited Certificate of the other appellees, the Mackell warranty is different in several significant respects. First, and most important, the defects warranted include not only structural defects in the "components constituting the Unit" the Mackells purchased, but also "any defect in or relating to the plumbing and sewer ventilation lines located both within and outside the designated boundaries of any Unit, whether or not such lines are deemed by the Declaration to be part of the Unit. Declarant will also correct any water related

---

20. The Residential Association is not a plaintiff in any of the lawsuits filed by appellees. Whether appellees may bring breach of warranty claims based on defects to common areas or other units under the warranty issued to the Residential Association or any other basis is an issue which has not been raised before us, and which goes to the merits of the dispute, and not to the threshold issue of whether the agreements between the parties mandate that the present disputes be resolved through arbitration.

damage to or associated with the Unit, including, without limitation, the eradication of mold spores within the Unit, consistent with practices in the industry at the time." And, unlike the other Certificates of Limited Warranty, which expressly disclaimed damages, the Mackells are covered for "direct and consequential damages incurred ... resulting or arising from the failure of, or defect in," any warranted item. Second, rather than designate the project's architect as arbitrator, the Amended and Restated Certificate appoints as apparently unaffiliated entity, Consolidated Engineering Services, Inc. ("CESI"), to perform that function. Third, the warranty period extends beyond the two years of settlement (December 19, 2000) required by the Condominium Act to the later of (i) July 16, 2004, (ii) one year from the date warranty work is completed, or (iii) one year from the date that CESI issues a certification that "the corrective work in those areas identified by CESI has been properly completed by or on behalf of the [appellants], and that the installation of the affected Common Elements and the selected Unit elements comply with requirements of relevant building product manufactures and with all applicable and generally accepted industry standards applicable to luxury multi-family residential buildings in the District of Columbia."

We think that the broader scope of the Mackell warranty, as well as the selection of an independent arbitrator not involved in the design of the building, evidence an intent to submit to arbitration at least some of the claims made by the Mackells in their complaint. Applying the presumption in favor of arbitration, *see Lopata,* 735 A.2d at 936, we are unable to say, with "positive assurance" that warranty claims made by the Mackell appellees were not intended to be subject to arbitration. *AT & T Techs.,* 475 U.S. at 650, 106 S.Ct. 1415.

■■■ In reaching this conclusion, we cannot ignore that the Mackells' Certificate also includes the provision in Section I.A.(2), see *supra* p. 148, that refers to commencement of judicial proceedings "for breach of any obligation" under the warranty.[21] But we do not go so far as to say, however, that under this section of the Certificate, judicial recourse to enforce *any* warranty claim remains available, in lieu of arbitration, so long as notice is given within the two-year warranty period and is filed in court within five years of the effective date of the warranty. In our view, such a broad reading would render nugatory the arbitration provision in Section V.B. and we are required to interpret the contract as a whole, "giving effect to each of the provisions, where possible." *Akassy v. William Penn Apts., Ltd. P'ship,* 891 A.2d 291, 303 (D.C.2006). Although the Certificate's language and structure are hardly models of clarity, it is possible to give effect to both provisions (Section I.A.(2) and V.B.), by a selective application of the arbitration clause to some but not all warranty disputes. As the Certificate provides, the procedures leading to arbitration by the Project Architect laid out in Section V are "established to permit maximum efficiency *in administering work under warranty* " (emphasis added), through the use of the Pre–Settlement Inspection Form and the Warranty Inspection Form attached to the Certificate as Exhibits A and B. By its terms, the arbitration provision is limited to situations

---

**21.** Because we have concluded that the narrower coverage of the Limited Warranty applicable to the other appellees did not extend to the common elements, including plumbing and other systems in the building, we had no occasion to consider Section I.A.(2) in determining the question whether they are bound to arbitrate under the Certificate of Limited Warranty.

where "the Unit Owner and the Declarant's representative fail to agree upon the defects to be noted on the Warranty Inspection Form." Section V.B. That would leave for judicial resolution under Section I.A(2), "[a]ny other defects that may arise subsequent to the completion of the Warranty Inspection Form, during the period covered by the Limited Warranty Certificate," which are to be handled "individually" upon written notice by the unit owner to appellants. Section V.A.(3) (emphasis added).[22] Although we recognize the presumption in favor of arbitration that is raised once it is established that the parties have agreed to some arbitration, the arbitration clause here is not a comprehensive commitment to submit to arbitration "all disputes, controversies or differences between the parties." See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc., 473 U.S. 614, 625 n. 13, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Rather, it is a more modest agreement to arbitrate disputes concerning the identification of defects to be addressed via the Inspection Form procedure. Because the limiting language in the Certificate's arbitration clause does not support a reading that would compel arbitration of all warranty claims, and because we also must give effect to the parties' inclusion of a provision calling for judicial recourse, we are constrained to so construe the language in the agreement, even though the resulting balance may not appear to us to be the most efficient, logical, or compelling.

■■■■■ As noted, the Mackells sued to rescind their purchase of a condominium unit at the Ritz, as an alternative to damages. Although the legal basis or nature of a cause of action does determine its arbitrability vel non, see id. at 628, 105

S.Ct. 3346, "insofar as the allegations underlying the [] claims touch matters covered" by the agreement to arbitrate, id. at 625 n. 13, 105 S.Ct. 3346, the claim must nonetheless come within the contemplation of the parties' agreement to arbitrate. The Mackell Certificate of Limited Warranty expressly provides that appellants will "repair or replace" defects covered by the warranty and be liable for certain "direct and consequential damages," up to $25,000 "per occurrence per Unit damaged." Without in any way commenting on whether the Mackells can maintain a claim to rescind their Purchase Contract with appellants based on fraudulent inducement, we can say with "positive assurance" that even under the more comprehensive coverage of their Amended and Restated Certificate of Limited Warranty, the parties never contemplated that the arbitrator, an engineering company, would be responsible for determining the Mackells' claim to set aside their purchase contract altogether, rather than settle disputes concerning the repair and/or compensation for defects they claimed should be listed on the warranty inspection form. We therefore conclude that the Mackells are not bound to submit to arbitration their claim for injunctive relief based on fraudulent inducement.

* * *

We therefore affirm the Superior Court's order denying appellants' motions to compel arbitration of the claims made by appellees McLeod, Foster, Johnson and Johnson–Brown, and remand their cases for further proceedings. We reverse in part the trial court's denial of the motion with respect to the Mackell appellees and remand with instructions that an order be

---

**22.** We note that the Certificates issued to the other appellees refer to "latent defects," arguably a narrower category than defects "other" than those listed on the pre-and post-settlement Warranty Inspection Forms.

entered compelling arbitration of disputes covered by the Amended and Restated Certificate of Warranty, as we have interpreted it here. Otherwise, the Mackells are not bound to arbitrate their claims. We leave to the trial judge to decide how "parallel judicial and arbitral proceedings should go forward," *id.* at 623, 105 S.Ct. 3346, including whether judicial economy would be better achieved by sequencing consideration of the issues to be decided by the arbitrator and the court.

*So ordered.*