*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CV-143

CANDI PETERSON, APPELLANT,

v.

WASHINGTON TEACHERS UNION, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-9629-15)

(Hon. Jeanette J. Clark, Motions Judge)

(Argued December 5, 2017      Decided September 6, 2018)

*Charles E. Wagner* for appellant.

*Daniel M. Rosenthal*, with whom *Lee W. Jackson* was on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and FISHER and THOMPSON, *Associate Judges*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Dissenting opinion by *Associate Judge* THOMPSON, at page 13.

BLACKBURNE-RIGSBY, *Chief Judge*: Appellant Candi Peterson appeals the

trial court's dismissal of her breach of contract claim against her former employer,

appellee the Washington Teachers Union ("WTU") pursuant to Super. Ct. Civ. R. 12 (b)(6). Because we find that res judicata[1] bars appellant's claim, we affirm the trial court's dismissal.

## I.

The Washington Teachers Union ("WTU") is a labor organization that acts as the exclusive bargaining agent for all personnel, except supervisors, of the District of Columbia Public Schools ("DCPS"). In December 2010, appellant was elected General Vice President of the WTU; she took a paid leave of absence from her DCPS position as a social worker/classroom teacher to assume this position.

In December 2010, WTU's newly-elected President, Nathan Saunders, drafted a compensation agreement for appellant, and an identical contract for

---

[1] "Under the doctrine of res judicata or claim preclusion, a final judgment on the merits embodies all of a party's rights arising out of the transaction involved, and precludes relitigation in a subsequent proceeding of all issues arising out of the same cause of action between the same parties or their privies, whether or not the issues were raised in the first trial." *Molovinsky v. Monterey Co-op., Inc.*, 689 A.2d 531, 533 (D.C. 1996) (internal citation and quotation marks omitted).

himself.   Appellant's contract provided for a salary of $151,000[2] and included several important provisions, most notably:

> 8. Any disputes concerning compensation shall be arbitrable using the American Arbitration Association.
>
> 9. WTU will promptly pay all expenses associated with the arbitration including legal representation by both parties.
>
> 10. Any provision included herein deemed illegal shall be unenforceable.  All other provisions shall remain in full affect.
>
> 11. Any dispute shall be considered resolved in its entirety by payment of the disputed amount.
>
> 12. Non-payment of compensation will accrue as a WTU liability and is not waived.  Non-payment of compensation shall create a priority wage lien due in full at the end of [appellant's] term.

On July 26, 2011, Saunders suspended the WTU's portion of appellant's compensation agreement ($51,000) after both parties engaged in a heated argument in front of field representatives over who was in charge of a matter involving

---

[2]  Appellant's salary was based on (1) her $100,000 salary that she earned as a classroom teacher, and (2) an additional amount of $51,000 for her services as General Vice President of the WTU.

teachers who had been discharged.[3] After this disagreement, Saunders issued a letter informing appellant that she had been removed from office and her pay terminated until she met with him to rectify the situation. In response, appellant contacted *The Examiner*, which published a story alleging that Saunders was pushing appellant out and had verbally abused her. Saunders, believing these comments to be derogatory, sent appellant a letter demanding that she meet with him. At the subsequent meeting, Saunders gave appellant a non-negotiable settlement agreement which demanded that appellant admit inappropriate conduct; that she submit a written letter of apology; that she agree to a financial penalty; and that she refrain from contacting the press about the matter. The letter also stated that appellant's pay, which had been withheld, would not be returned unless appellant agreed to these demands. Appellant refused to sign the agreement, and in response, Saunders drafted a disciplinary resolution.

On August 4, 2011, Saunders scheduled a meeting to be held that evening to address the disciplinary resolution; appellant was not provided any notice of this meeting or its resolution, but learned about it indirectly. At the August 4th meeting, the Executive Board adopted Saunders's resolution, suspending

---

[3] This disagreement followed an earlier dispute between Saunders and appellant pertaining to appellant's continuation of her blog.

appellant's supervisory authority over field representatives for a period of six months and terminating the additional compensation appellant received from WTU ($51,000) above the DCPS amount ($100,000). On September 6, 2011, Saunders informed DCPS that he had rescinded appellant's leave of absence to serve as the WTU General Vice President; appellant was instructed to return to the classroom as a social worker/classroom teacher.

On December 2, 2011, appellant filed a demand for arbitration, asking for lost wages and to be reinstated in her position as WTU's General Vice President with all powers and compensation restored; she claimed that the WTU's action violated the WTU's Constitution and By-Laws and the District of Columbia's Comprehensive Merit Personnel Act ("CMPA"), D.C. Code § 1-617.03 (a)(1) (2012 Repl.).

On March 5, 2012, Arbitrator Stanley Mazaroff ("Arbitrator") issued a decision addressing jurisdiction and the arbitrability of appellant's claims. The Arbitrator noted that the compensation agreement expressly stated that, "[a]ny disputes concerning compensation shall be arbitrable using the American Arbitration Association," and that his jurisdiction was specifically limited to

"disputes concerning compensation." Accordingly, appellant's claim for relief seeking reinstatement was outside the permissible scope of arbitration.

At a status hearing before the Arbitrator on March 14, 2012, appellant redefined her claim, alleging that the WTU breached her compensation contract. On August 24 and 30, 2012, the parties appeared for an evidentiary hearing on the merits of appellant's claim. On September 24, 2012, the Arbitrator issued his decision, concluding that appellant and the WTU "entered into a legally enforceable agreement pertaining to [appellant's] compensation and her right 'to arbitrate any disputes concerning compensation.'"

Ultimately, the Arbitrator found that Saunders and the WTU Executive Board did not have the authority to suspend appellant's compensation under her contract. Similarly, removal under the WTU's Constitution and By-Laws mandated a recall petition, which was never filed, and a vote by the WTU's membership. On the breach of contract claim, the Arbitrator awarded appellant $71,065.82, the amount she had been denied in compensation and benefits from the date of her removal to the date of the arbitration hearing. The Arbitrator's September 24, 2012, award noted that "[t]his award resolves all claims and counterclaims submitted by [appellant] and the WTU to arbitration except for

[appellant's] pending claim for attorney's fees and costs. All such claims . . . not expressly granted herein are hereby denied." The Arbitrator's award also noted that appellant's claim that the WTU violated her rights under the CMPA involved statutory issues, and thus, fell outside the scope of the arbitration provision. Accordingly, the CMPA claim was dismissed without prejudice. On December 6, 2012, the Arbitrator also awarded appellant $51,739 in attorney fees, and $1,937.25 in costs. Appellant subsequently sought to have her arbitration award confirmed.[4] On October 10, 2013, Judge John M. Mott confirmed the arbitration award.

On December 14, 2015, appellant filed a complaint for breach of contract, seeking compensation to cover the period between August 24, 2012 (the date of the arbitration trial) and July 31, 2013 (the date appellant's term expired). WTU responded by filing a motion to dismiss, claiming that appellant was seeking additional damages that she could have sought in arbitration but that she did not do so, and that her complaint was barred by res judicata. On February 4, 2016, the trial court issued an order granting WTU's motion, finding that appellant's claim

---

[4] Pursuant to Super. Ct. Civ. R. 70-I (Confirming, Vacating, or Modifying Arbitration Award Under the Arbitration Amendments Act of 2007) and D.C. Code §§16-4405 (2012 Repl.) (Application for Judicial Relief) and -4422 (Confirmation of Award).

was barred under res judicata. On February 11, 2016, the trial court denied appellant's motion for reconsideration. On February 12, 2016, appellant filed the instant appeal, arguing that res judicata does not bar her claim.

## II.

We review *de novo* an order granting a motion to dismiss a complaint pursuant to Super. Ct. Civ. R. 12 (b)(6). *Solers, Inc. v. Doe*, 977 A.2d 941, 947 (D.C. 2009). We accept all factual allegations in the complaint as true, and "construe all facts and inferences in favor of the plaintiff." *Id.* (internal quotation marks omitted).

To determine whether res judicata bars a subsequent action, we examine

> (1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case.

*Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C. 2012).

In this case, the compensation claim stemming from the employer's breach of contract was adjudicated finally in the first action—appellant confirmed the

Arbitrator's award in a Superior Court proceeding before Judge Mott, which has a preclusive effect on future litigation stemming from the same claim and involving the same parties. *See Apparel Art Int'l, Inc. v. Amertex Enter. Ltd.*, 48 F.3d 576, 585 (1st Cir. 1995) ("An arbitration award generally has res judicata effect as to all claims heard by the arbitrators."). As "a final judgment on the merits embodies all of a party's rights arising out of the transaction involved," appellant cannot relitigate the breach of contract claim previously adjudicated by the Arbitrator. *Faulkner v. Gov't Emps. Ins. Co.*, 618 A.2d 181, 183 (D.C. 1992) (internal quotation marks omitted).

Second, appellant could have raised her present claim, related to unpaid compensation, before the Arbitrator. *See id.* at 183 (stating that res judicata "precludes relitigation . . . of all issues arising out of the same cause of action between the same parties or their privies, whether or not the issues were raised in the first trial"). In determining if two cases stem from the same cause of action, we "have considered the nature of the two actions and the facts sought to be proved in each one." *Amos v. Shelton*, 497 A.2d 1082, 1085 (D.C. 1985). In appellant's opposition to the motion to dismiss, she stated that the arbitration focused on the issues of "whether the Compensation Agreement amounted to a legally binding contract . . . and . . . [whether] the WTU breach[ed] this agreement." The

complaint before the trial court also sought damages based on this same breach of contract, and thus, "the essence of the second action was exactly the same as that of the first." *Id.* (internal brackets and quotation marks omitted).

Appellant contends that the Arbitrator lacked the jurisdiction to award her front pay, and that he had no equitable powers. This contention is incorrect. Arbitration "is a matter of contract" and is "governed by normal principles of contract law." *2200 M St. LLC v. Mackell*, 940 A.2d 143, 150 (D.C. 2007) (internal quotation marks omitted). The parties' agreement constituted an explicit consent to arbitrate "any and all disputes relating to or concerning compensation . . . ." As the Arbitrator had jurisdiction over any and all issues related to compensation, a request for front pay would clearly fall within his purview, despite appellant's assertion that the parties "did not agree to arbitrate any issue involving prospective wages." Moreover, nothing prevented appellant from seeking both past and future damages in the arbitration proceeding, despite her contention that a claim for prospective damages would have been unripe at the time of arbitration.[5]

---

[5] In *Keller v. Marvins Credit, Inc.*, an employee was terminated three years into his five-year contract. 147 A.2d 872, 873 (D.C. 1959). The employee then filed a breach of contract complaint seeking compensation owed to him as of the date he filed suit. *Id.* He subsequently filed a second breach of contract suit seeking compensation owed to him for the time between the first and second complaint. *Id.* In the *Keller* holding, we stated that "[t]he general rule is that an

(continued . . .)

Similarly, appellant contends that the Arbitrator did not have any equitable powers because he found that he did not have the jurisdiction to order the WTU to reinstate appellant as Vice President. The Arbitrator lacked this jurisdiction to order reinstatement, however, because the request for reinstatement was not an issue involving compensation. Moreover, there is nothing in the D.C. Uniform Arbitration Act that would have barred the Arbitrator from issuing an equitable remedy, so long as that remedy concerned compensation, and appellant had requested it.[6]

---

(. . . continued)

employee who is discharged in violation of his contract of employment may sue only once and at that time recover all present and prospective damages." *Id.* (internal quotation marks omitted). *See also District of Columbia v. Jones*, 442 A.2d 512, 524 (D.C. 1982) ("The measure of damages in an employee's action against his employer for breach of the employment contract is generally the compensation that would have been due to the employee during the unexpired period of employment with appropriate reduction to present worth.") (internal quotation marks omitted).

[6] D.C. Code § 16-4421 (c) (2012 Repl.) states that

> (c) . . . an arbitrator may order such remedies as the arbitrator considers just and appropriate under the circumstances of the arbitration proceeding. The fact that such a remedy could not or would not be granted by the court is not a ground for refusing to confirm an award under § 16-4422 or for vacating an award under § 16-4423.

Appellant also contends that ☐ 12 in her contract permitted the splitting of claims for any compensation that had not been previously sought from the Arbitrator, that such unpaid compensation accrued as a WTU liability and was not waived, and that non-payment would create a priority wage lien due in full at the end of her term. *See Gilles v. Ware*, 615 A.2d 533, 543 (D.C. 1992) (citation and internal quotation marks omitted) ("Under the Restatement, res judicata does not apply to extinguish a claim if [t]he parties have agreed in terms or in effect that the plaintiff may split his [or her] claim, or the defendant has acquiesced therein."). The language in appellant's contract does not constitute acquiescence to claim-splitting and the filing of multiple actions; rather, it contains language about the permissible timing of an action for unpaid compensation, allowing her to defer an action until the end of her term. Under the contract language, appellant could have waited until the end of her term to seek all compensation owed for WTU's breach of contract, which would have precluded WTU from asserting res judicata. Appellant, however, opted to pursue a claim in the middle of her term; in seeking a mid-term award, she obtained a final judgment addressing the rights and liabilities of both parties arising from WTU's contract breach.

Finally, there is no dispute that the parties to the arbitration are the same parties to the present action, and thus, this issue merits no discussion.

**III.**

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*

THOMPSON, *Associate Judge*, dissenting: As the majority opinion recounts, after the Washington Teachers Union President ("WTU") and Executive Board decided to terminate the additional compensation to which appellant Peterson was entitled by virtue of her election as WTU Vice-President ($50,000 per year during a three-year term, supplementing the salary she earned as a classroom teacher), appellant filed a demand for arbitration, seeking to recover her withheld compensation. The arbitrator awarded her $71,065.82, the amount she had been denied in additional compensation through the date of the evidentiary arbitration hearing. Peterson thereafter initiated the instant litigation to recover the additional compensation she claimed was due to her from that point until the end-date of her three-year term. The trial court dismissed her claim on the basis of the *res judicata* effect of the confirmed arbitration award. Agreeing with the trial court's application of the doctrine of *res judicata*, my colleagues in the majority reason

that "the compensation claim stemming from [WTU's] breach of contract was adjudicated finally in the [action confirming the arbitration], . . . which has a preclusive effect on future litigation stemming from the same claim and involving the same parties." *Ante*, at 9.  I disagree and therefore respectfully dissent.

To help explain why I am unable to agree with my colleagues' resolution of this appeal, I think it will be helpful to quote at some length from the arbitrator's decision:

> This brings us to the central issue in this case:  whether the revocation of Peterson's compensation by Saunders and the Executive Board violated the Compensation Agreement.  As noted, the Compensation Agreement states that Peterson's compensation should continue during Peterson's three[-]year term as General Vice President.  The key words in the Compensation Agreement are that Peterson's salary and the other terms of her compensation "shall remain in full affect." Significantly, the Compensation Agreement vests no authority in the WTU's President or its Executive Board to cease paying this compensation.  The Compensation Agreement likewise provides no grounds for revoking, terminating or refusing to pay Peterson's salary.  It appears from the terms in the Compensation Agreement that the WTU's obligation to pay Peterson her compensation for service as the General Vice President was unconditional.
>
> The Compensation Agreement, however, must be read and understood in the context of the WTU's Constitution and By-Laws [which the Compensation Agreement incorporates by reference].

. . .

The only means set forth in the Constitution and By-Laws for removing Peterson from her elected position as General Vice President and ending her compensation was through Recall. Peterson was placed in office by the vote of the WTU's membership, and any decision to terminate her was in the words of the Constitution "the right" of the members. The WTU did not follow this path. It is undisputed that no Recall petition was ever filed against Peterson by the Executive Board, or by [WTU President] Saunders or by any other union member.

When on July 26, 2011, Saunders summarily removed Peterson from the WTU payroll "for failure to perform the duties association with [her] position," he acted as though he had the czar-like power to do this. He did not. The Constitution and By-Laws vested no authority in the President to remove the elected General Vice President from the WTU payroll and to stop her from performing the duties that were assigned to her by the Union's Constitution and By-[L]aws. Although the President, as indicated in Article VIII of the By-Laws, had the authority to supervise the WTU's "employees," that authority did not authorize the President to cancel the pay and truncate the authority and responsibility of another elected official. Significantly, the action taken by Saunders against Peterson was not based on Peterson's status as an employee but as the elected General Vice President. It was Peterson's authority and salary as the second highest ranking, elected union officer that was under direct attack, not her status as an employee.

. . .

Assuming *arguendo* that the Executive Board had the authority to cease paying Peterson's salary and to terminate her supervisory authority, the manner in which the Executive Board exercised such authority abridged both the letter and the spirit of the WTU Constitution and

By-Laws. . . . Saunders and the Executive Board rushed to judgment without hearing a word from Peterson, acting as if its primary goal was to cut her pay, cut her authority and as a practical matter railroad her out of office. . . . Peterson was entitled to a hearing and the other elements of due process contemplated by the WTU's Constitution and By-Laws.

. . .

Saunders was [earlier] on record as subscribing to the belief that, "the only remedy available to deal with situations when the General Vice President is not performing his duties is to go through the recall process set forth in the WTU Constitution and By-Laws."

. . .

In summary, neither the letter nor the spirit of the WTU's Constitution and By-Laws permitted Saunders or the WTU's Executive Board to summarily revoke, without a hearing or due process, the compensation that Peterson was entitled to receive under the terms of the Compensation Agreement. Peterson was not a rank and file employee who served at the will or pleasure of union officials. She was an *elected* official who, under the terms of the Constitution, had a fixed, three-year term of office and who was entitled to compensation for her service throughout her term.

The arbitrator also wrote this footnote:

The undersigned arbitrator offers no opinion regarding the merits of the allegations made against Peterson by Saunders in his letter dated July 26, 2011[,] or regarding the merits of the charges made against Peterson by the Executive Board in its Resolution dated August 4, 2011. Nor does the arbitrator express any opinion regarding whether Peterson was satisfactorily performing her duties as General Vice President or whether she could or should have been recalled under the terms of the Constitution

and By-Laws.  This Opinion and Award is addressed to and resolves the basic issue in this arbitration of whether the WTU's President and its Executive Board, acting on behalf of the WTU, breached the contractual terms of the Compensation Agreement by terminating Peterson's compensation.

As can be discerned from the arbitrator's decision, the agreement between appellant and WTU was neither at-will employment at the pleasure of the WTU Executive Board and President, nor the run-of-the-mill employment contract which the employer was free to rescind for cause based solely on her or his own business judgment.  As the arbitrator recognized, appellant's entitlement to continue to serve as WTU Vice-President and to receive the additional compensation in issue were the fruits of a vote of the WTU membership and could be terminated only through a membership recall election.  So, when the arbitrator concluded that appellant was entitled to $71,065.82 in additional compensation through the close-of-evidence date at the arbitration hearing, he had as a basis for the award the fact that the membership had not petitioned or voted to recall appellant as Vice-President[7] (and, as the arbitrator observed in his "[a]ssuming *arguendo*" paragraph, the additional fact that appellant had not been afforded the due process that the

---

[7]  The arbitrator noted that "[e]lected officers, like Peterson, . . . can only be removed or in other words recalled by a petition signed by thirty percent of the membership" and that it "is undisputed that no Recall petition was ever filed."

WTU Constitution and By-Laws required before she could be constructively discharged form her position).

Not knowing whether a recall election would be held (or a due-process hearing afforded) before the end of appellant's term, the arbitrator had no basis for determining that appellant was entitled to additional compensation through the end of the three-year term to which she was elected.[8] The situation was quite different from cases in which the fact and amount of front-pay damages can reasonably be ascertained because it is clear (or can be fairly inferred) that the employer, who is the sole decision-maker, has no intention of allowing the employee to return.[9] Indeed, in light of the arbitrator's finding that the WTU President and Executive Board had no authority to suspend appellant's compensation, a reasonable observer would likely have expected that appellant would be reinstated and paid the additional compensation attendant to her office as until such time as a recall election was held.

---

[8] As Peterson puts it in her brief, the arbitrator "had no way of knowing whether the WTU would later allow Peterson to resume her duties with pay, after he had rendered his decision." And as the arbitrator himself put it, he could not say whether Peterson "could or should have been recalled under the terms of the [WTU] Constitution and By-Laws."

[9] *Keller v. Marvins Credit, Inc.*, 147 A.2d 872 (D.C. 1959), discussed in the majority opinion, appears to be such a case. Keller was told by the employer that "his services were no longer desired." *Id.* at 873.

Given all the foregoing, I believe that the doctrine of *res judicata* does not apply so as to bar appellant's claim. "Under the doctrine of res judicata . . . a judgment estops not only as to every ground of recovery or defense actually presented in the action, but also as to every ground which might have been presented[.]" *Henderson v. Snider Bros.*, 439 A.2d 481, 485 (D.C. 1981) (internal quotation marks omitted) (en banc). The doctrine applies "[w]hen the parties are the same, and the essence of the claim and the evidence necessary to establish it are the same." *Id.* at 484. "In determining whether *res judicata* applies, we consider (1) whether the claim was adjudicated finally in the first action; (2) whether the present claim is the same as the claim which was raised or which might have been raised in the prior proceeding; and (3) whether the party against whom the plea is asserted was a party or in privity with a party in the prior case." *Calomiris v. Calomiris*, 3 A.3d 1186, 1190 (D.C. 2010) (internal quotation marks and alterations omitted).

Here, "the evidence necessary to establish [appellant's claim]" is *not* the same as it was with respect to the claim that was before the arbitrator. *Henderson*, 439 A.2d at 484. In the arbitration proceeding, for appellant to prevail, the evidence had to show (as it did) that no recall election had happened as of the date

the record closed, i.e., August 30, 2012. In the instant case, for appellant to prevail, the evidence must establish that she also was not recalled at any time after that date and before the end of her term (apparently, November 30, 2013). Further, because appellant's entitlement to continue as WTU Vice-President and to earn additional compensation through November 30, 2013, depended on what the WTU membership did after the arbitration hearing, appellant's claim could not have been and "was [not] adjudicated finally in the first action." *Calomiris*, 3 A.3d at 1190. A claim that appellant was owed additional compensation for the period from August 30, 2012, through November 30, 2013, because no recall election occurred before the latter date was not a "ground which might have been presented" during the arbitration proceeding. *Henderson*, 439 A.2d at 485 (internal quotation marks omitted). Rather, this is a case in which "additional facts emerged after the conclusion of the [arbitration] which gave rise to additional claims." *Utah Republican Party v. Cox*, 177 F. Supp. 3d 1343, 1361 (D. Utah 2016).

For all the foregoing reasons, I would hold that appellant's claim is not barred by *res judicata*.[10]

---

[10] I also think the majority opinion gives short shrift to the contract provision that appellant argues allowed her to split her claims. *See Gilles v. Ware*, 615 A.2d 533, 550-51 (D.C. 1992) (recognizing that an acquiescence to claim-
(continued . . .)

---

(. . . continued)

splitting can overcome a *res judicata* defense). The relevant provision is ¶12 of appellant's Compensation Agreement with the WTU, which provided:

> Non-payment of compensation will accrue as a WTU liability and is not waived. Non-payment of compensation shall create a priority wage lien due in full at the end of [appellant's] term.

My colleagues read this language as merely allowing appellant "to defer an action until the end of her term," *ante*, at 12, i.e., to wait until the end of her elected term before initiating any action to recover the compensation owed. But the second sentence refers to creation of a lien at the end of appellant's term. Generally speaking, "[a] lien affords a supplemental and additional remedy." *Landis Machine Co. v. Omaha Merchs. Transfer Co.*, 9 N.W.2d 198, 203 (Neb. 1943) (observing also that "a lien is regarded as remedial and must be so construed as to give full force and effect to the remedy"); *see also, e.g.*, 53 Am. Jur. 2d *Mechanics' Liens* § 322 ("[T]he remedy upon a construction lien and the remedy upon the debt are distinct and concurrent and may be pursued at the same time or in succession."). I am inclined to read ¶12 as affording appellant a supplemental opportunity, after the end of her elected term, to recover the compensation due to her, notwithstanding the arbitration award she obtained mid-term.